STATE BOARD OF TAX APPEALS.

SHELTON PITNEY AND WALTER P. GARDNER, TRUSTEES OF THE CENTRAL RAILROAD COMPANY OF NEW JERSEY. PETITIONERS, v. WILLIAM D. KELLY, STATE TAX COMMISSIONER OF NEW JERSEY, RESPONDENT.

CITY OF JERSEY CITY, PETITIONER, v. WILLIAM D. KELLY, STATE TAX COMMISSIONER OF NEW JERSEY, AND SHELTON PITNEY AND WALTER P. GARDNER, TRUSTEES OF THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, RESPONDENTS.

Decided November 8, 1943.

For the petitioners Shelton Pitney and Walter P. Gardner, trustees of the Central Railroad Company of New Jersey, *Joseph F. Autenrieth* and *William F. Hanlon*.

For the petitioner City of Jersey City, *Charles A. Rooney* and *Joseph C. Glavin*.

For the State of New Jersey, *David T. Wilentz*, Attorney-General, and *Milton B. Conford*, Assistant Attorney-General.

BY THE BOARD. (Commissioners Harrigan, Hoff, Huegel, Sharp and Smith, concurring.) These cases consist of two jointly heard appeals. One is by the trustees of the Central Railroad Company of New Jersey, asking for reductions in the final 1943 assessment of $78,187,344, made by the State Tax Commissioner on all its property in railroad use and praying for certain other relief. The only specific property as to which these petitioners offered any proof consists of lands situated in the cities of Jersey City and Bayonne. The other is an appeal by the City of Jersey City requesting an increase in the 1943 assessment of all of the second class lands and some of the structures of the company located in that taxing district. The city also claims that part of the property of the railroad company assessed as main stem or Class I was improperly assessed as such by the State Tax Commissioner, and requests that this Board transfer same to second class. The Attorney-General defends the assessments as made and requests that they be affirmed.

The railroad company has introduced proof both by real estate experts and others. Counsel for the trustees contend that the aggregate assessment of Class II lands in Jersey City, in the sum of $21,757,449, for the year 1943, should be reduced to the sum of $6,000,000, and that the assessment of main stem lands in the cities of Jersey City and Bayonne should be reduced from $2,338,293, to the sum of approximately $1,000,000. The City of Jersey City is not interested in the valuation of the main stem properties, but requests an increase in the valuation of Class II lands for the year 1943, to the sum of $37,148,560 and also that the assessment of

certain structures on the property should be substantially increased.

This case was tried at great length, approximately four thousand pages of testimony having been taken. Very many exhibits were offered in evidence by the railroad company, the city and the state. Careful consideration has been given to all of the proofs and to the lengthy briefs submitted by counsel. We also have heard oral argument over a period of two days. We have concluded that the appeals both by the railroad company and by the city should be dismissed.

The property under appeal consists of a large waterfront railroad terminal fronting on the junction of the Hudson River and New York Bay. It is situated opposite the tip of the Battery on Manhattan, and has central access to all parts of New York Harbor. Its location is slightly south of the center of the almost continuous string of railroad waterfront terminal lands, which run from the Greenville Terminal of the Pennsylvania Railroad Company on the south, to the West Shore Branch of the New York Central Railroad Company in West New York, on the north. Practically the only properties on this waterfront not owned by any railroad are certain tracts held by the Hoboken Land & Improvement Co., and other parcels owned by municipal or federal authorities. For various periods of time up to almost 100 years, the railroad properties have been constantly occupied and used as such. The property under appeal in this case was originally acquired by the Central Railroad Company of New Jersey or affiliated interests about 80 years ago, and it has continuously used this terminal location for practically the same purposes as at present, since 1864.

While this company, like other railroad companies, has had its economic ups and downs, we are satisfied that the property under appeal has to-day the same high degree of suitability and adaptability for railroad terminal purposes which it always has had, just as the similar nearby properties of other railroad companies along the Hudson River and New York Bay.

In the case of *Long Dock Co.* v. *State Board of Assessors,* 89 *N. J. L.* 108; 97 *Atl. Rep.* 900, 902; *affirmed,* 90 *N. J. L.*

701; 101 *Atl. Rep.* 367, a nearby similar railroad terminal was described by the court as follows:

"This is a great terminal property opposite New York City, and which, while it is in fact connected with the Long Dock railroad, might be connected with any other railroad now operating from the Jersey side, or that might be organized so to operate. If the Erie Railroad Company should go out of business it could be used for a terminal connecting with all the railroads terminating between Communipaw and Weehawken. Taken by itself it is a great unified tract with deep water in front and railroad communications behind. We think it is idle to argue, as do prosecutor's experts, that it is to be split into two, or three, or four or more zones, each to be valued separately. Every part of this main tract depends for its value in some measure on every other part. There are tracts of land elsewhere that are worth more when cut up into building lots, and there are also tracts worth more because assembled and peculiarly adaptable to business. This is one of the latter class."

The evidence offered by the City of Jersey City and by the state in this case shows that the terminal property under appeal, taken as a whole, has a very high measure of availability for railroad purposes, and leads us to conclude that its value for such purposes exceeds that which it might have for average business or industrial purposes. This proof was given not only by real estate experts, but was supported by testimony given by a highly qualified utility valuation engineer, Mr. Van Hook, and an outstanding expert in railroad operations, Mr. Mantell, former vice-president of the Erie Railroad Company for many years and in charge of all terminal railroad operations in the Port of New York on behalf of the United States Railroad Administration during the last war. Such evidence is held to be of first importance in valuing property of this character for taxation. *Long Dock* v. *State Board of Assessors,* 78 *N. J. L.* 44; 73 *Atl. Rep.* 53; affirmed, 79 *N. J. L.* 604; 80 *Atl. Rep.* 1135; *Long Dock Co.* v. *State Board of Assessors,* 82 *N. J. L.* 21; 81 *Atl. Rep.* 568; affirmed, 84 *N. J. L.* 762; 88 *Atl. Rep.* 1103; *Long Dock Co.* v. *State Board of Assessors,* 89 *N. J. L.* 108; 97

*Atl. Rep.* 900; *affirmed,* 90 *N. J. L.* 701; 101 *Atl. Rep.* 367; *Pennsylvania Railroad Co.* v. *Jersey City,* 98 *N. J. L.* 283; 119 *Atl. Rep.* 99; 125 *Atl. Rep.* 921; *United New Jersey Railroad and Canal Co. and other Companies* v. *State Board of Taxes and Assessments,* 100 *N. J. L.* 131; 125 *Atl. Rep.* 335; *United New Jersey Railroad and Canal Co. and other Companies* v. *State Board of Taxes and Assessments,* 101 *N. J. L.* 303; 128 *Atl. Rep.* 427; *United New Jersey Railroad and Canal Co. and other Companies* v. *State Board of Taxes and Assessments,* 103 *N. J. L.* 33; 134 *Atl. Rep.* 669; *Lehigh Valley Railroad Co.* v. *State Board,* 12 *N. J. Mis. R.* 673; 174 *Atl. Rep.* 359.

The proof put into this case by the railroad company which purports to show a low value for the property "in railroad use," does not, in our opinion, have any materiality on the question of the inherent availability or value of this property for railroad purposes, a consideration which the cases cited above indicate to be an important feature of the valuation for tax purposes of this kind of property.

The proofs of the petitioner railroad company, in this connection, are along two lines. In the first place, great stress is laid upon the fact that the company went into federal reorganization proceedings in October, 1939. An exhibit purporting to show accounting statistics of the railroad company for a number of years past was introduced through the Assistant Comptroller of the company. These figures were designed to show that the company has barely earned enough to pay its New Jersey taxes in past years. We find that the exhibit is grossly misleading in that the figures are contrived in violation of the uniform rules of accounting prescribed by the Interstate Commerce Commission. Those rules are formulated primarily to show "net railway operating income," which is the figure upon the basis of which the Interstate Commerce Commission determines whether the railroad company is earning an adequate return, for rate fixing purposes. This is arrived at by deducting from operating revenues all operating expenses, railway tax accruals and joint facility and equipment rentals. The exhibit offered by the Assistant Comptroller noticeably avoids any indication of the net rail-

way operating income of the company for past years. It also improperly, in violation of Interstate Commerce Commission regulations, sets up rentals for leased lines as a charge prior to tax accruals and fails to show the non-operating income of the railroad, which is properly available to meet rents for leased lines and other "fixed charges."

The Attorney-General, on the other hand, has shown that the "net railway operating income" of the company was $259,144 in the year 1938, $1,943,304 in the year 1939, $1,364,795 in the year 1940, $5,088,050 in the year 1941 and $9,321,852 in the year 1942. The 1942 figure is substantially the same as what the net railway operating income of the company was in the years 1928 and 1929, which are admitted by the assistant land and tax agent of the company to be two of the highest years of earnings in the railroad's history. The figures contained in the dissenting opinion of the president with respect to the rate of return earned by the railway company are based upon "net income," which we believe to be improper for this purpose, since it is arrived at after deduction not only of the items referred to above, but also of non-operating charges and expenses, and interest on indebtedness and rentals for leased lines.

The Attorney-General offered, in rebuttal of the line of proof by the railroad company based upon its past financial troubles, the testimony of three outstanding experts in the fields of railroad engineering and valuation, railroad credit, and railroad accounting. These were, respectively, Wendell A. Van Hook, of the New York firm of Ford, Bacon & Davis, Patrick B. McGinnis, expert, writer and instructor on the subject of railroad securities, specializing in defaulted issues, and Charles E. Barnes, railroad accountant in the State Tax Department. These experts gave testimony based upon very careful and exhaustive studies of the operations of the Central Railroad Company of New Jersey, supported by exhibits comparing the operational statistics of the company with other comparable railroad companies. These proofs lead to the strong suspicion, if not conviction, that the bankruptcy of the railroad company is due to one or more of the following causes: (a) defective management; (b) insufficient atten-

tion to the development of traffic possibilities; (c) control by the Reading Company, owner of the majority of the Central Railroad stock, and indirectly by the Baltimore and Ohio Railroad Company, principal stockholder of the Reading; (d) inadequate participation by the Central in through rates on freight interchanged with the Reading and the Baltimore and Ohio; (e) unsound proportion of bonded indebtedness and capitalized rentals of leased properties, as contrasted with stock, in total capitalization, resulting in excessive proportion of "fixed charges" against income; (f) inadequate creation of reserves during the prosperous period prior to 1931, coupled with a policy of excessive dividends on stock during the same period.

The factor of control by the Reading and the B. & O. Railroad Companies was corroborated by proof of the fact that the bondholders of the railroad company had petitioned the bankruptcy court to investigate the relationship between the Reading and the Central, by the fact that the Interstate Commerce Commission, in ratifying the appointment of the trustees of the road, had pointed out that one of the principal problems of the Central was the question of securing fair rate divisions on interchange received from the Reading, and finally, by the fact that during the course of the hearings in this case, the trustees dismissed all of the principal operational officials of the Central, who were also acting in a similar capacity for the dominant Reading Company, and displaced them by the appointment of Mr. William Wyer, who testified for the trustees as an expert in the present case, as chief executive officer.

While this Board obviously has neither the time nor the qualifications to make an adequate investigation of the proofs offered by the Attorney-General as to the matters just discussed, or any finding with respect to the relation between the factors testified to and the financial problems of this railroad company, nevertheless, the mere existence of the possibility of such factors is sufficient reason to discard proofs of the profits and expenses of the Central, under its administration by officers of its parent company, the Reading, as evidence of the value of its terminal lands in Jersey City for

tax purposes. Holdings to that effect in very similar circumstances were laid down by our courts in *West Shore Railroad Co.* v. *State Board of Assessors,* 82 *N. J. L.* 37 (at *p.* 40); 81 *Atl. Rep.* 351; *affirmed,* 84 *N. J. L.* 768; 85 *Atl. Rep.* 826, and *New Jersey Junction Railroad Co.* v. *Hendrickson,* 84 *N. J. L.* 413; 87 *Atl. Rep.* 68.

It is obvious that properties of other railroad companies, having similar characteristics of location, assemblage and consolidation, and proximity to the tidal waters of New York Bay and the Hudson River, have been used with apparent profit and success for many generations by other railroad companies. For example, the Pennsylvania Railroad Company owns and operates, as its only links to New York Harbor, two great waterfront terminals, one some distance south of the property under appeal, on New York Bay, and one a half mile to the north, on the Hudson River. The test of value for railroad purposes of property of this character, depends upon a study of "external conditions susceptible of universal application as a legal measure," and not upon factors which are "special and peculiar to the individual user of the land, proceeding as it were, from within." *Long Dock Co.* v. *State Board of Assessors,* 78 *N. J. L.* 44 (at *p.* 53); 73 *Atl. Rep.* 53, 57; *affirmed,* 79 *N. J. L.* 604; 80 *Atl. Rep.* 1135. This legal test completely disposes of the above described approach taken by the trustees to the valuation problem presented.

The second line of proof by the railroad company was to establish a contention that its Jersey City terminal lands have a value for railroad purposes of only sixty per cent. of their value for ordinary business purposes, on the ground that forty per cent. of the area is devoted by this railroad to operations which result in an overall loss to the company. The losing operations are the passenger, carfloat and lighterage traffic. The losses on carfloat and lighterage are concededly due to the "lighterage free" rule, under which shipments from points more than one hundred miles east of tidewater are entitled to transfer across the Hudson River and New York Bay free of charge. Mr. Wyer, railroad expert, testified that the Central was "stuck" on its lighterage busi-

ness received from its parent, the Reading Company, expense of handling it being greatly in excess of the compensation allowed the Central therefor by the Reading. All of the railroads bear this lighterage burden, not the Central alone, and they have all resisted attempts by the State of New Jersey to eliminate the rule, obviously because of other advantages which more than compensate them for the expense of the free lighterage. *State of New Jersey* v. *Baltimore and Ohio Railroad Co. et al.*, 245 *I. C. C.* 581 (at *p.* 589).

Practically all passenger operations of railroad companies generally are conducted at a loss. All roads are required to render this service, as a matter of public necessity, in order to retain their franchise.

The attempt of the railroad petitioner to devalue its terminal property on the above grounds is devoid of any sound basis. Moreover the railroad company has failed to furnish any explanation whatsoever as to how Mr. Wyer's "segregation study" has any bearing whatever on whether the Jersey City terminal lands are assessed at more than "true value."

The proofs offered by the real estate experts in this case, as usual, vary in the extreme. The assessment of the terminal lands was $21,757,449. The three experts for the railroad companies arrived at valuations of $9,427,829, $9,897,762 and $6,042,232, respectively. The real estate experts for the City of Jersey City arrived at valuations of $37,148,560, $36,181,200 and $33,371,000, respectively. The expert for the state appraises the property at $29,182,900. Each of the experts for the railroad company specifically limits his appraisal to value for industrial and steamship purposes. The experts for the City of Jersey City and for the state take into consideration value for all purposes, including railroad purposes. All of these experts appear to be competent and experienced appraisers of this type of property. An example of the extreme range of difference in viewpoint can be seen in the appraisals by the railroad witness, Thompson, and the Jersey City witness, Coffin, for parcel No. 8, Thompson's appraisal being $6,000 an acre, and Coffin's, $85,000 an acre. The assessed valuation of that parcel is $32,400 an acre.

The principal point which counsel for the railroad company seeks to establish is that sales of waterfront property within the last twenty-five years demonstrate a substantial decline in the true value of New York Harbor waterfront property on the New Jersey side. The response by the City of Jersey City is that there have been no sales of property truly comparable with a developed railroad terminal such as the property under appeal; that no railroad properties actually in railroad use have ever been sold on the Hudson River or New York Bay; and that there is a relatively constant level of values for property available for railroad terminal purposes and in railroad use. Both the city and the state contend that the occasional sales of small, isolated tracts of property, and the several abandonments of excess lands by the Central and Lehigh Valley Railroad Companies on New York Bay, due to an accumulation of unpaid taxes assessed locally against property originally acquired by those companies for expansion purposes, but never actually put to or needed for railroad use, have no bearing on the value of large assembled tracts well suited and actually used for many years for railroad waterfront terminal purposes.

There is much to be said for the points of view both of the railroad company and of the city. It is important to keep in mind the recent decisions of the Supreme Court of this state, indicating that great caution must be exercised in accepting any sales or transactions during the depression period as criteria of true value in a normal period or from the standpoint of a reasonably long range viewpoint. See *Colonial Life Insurance Co.* v. *State Board of Tax Appeals,* 126 *N. J. L.* 126 (at *p.* 129) ; 18 *Atl. Rep.* (2d) 625; *Plainfield* v. *State Board of Tax Appeals,* 127 *N. J. L.* 5; 20 *Atl. Rep.* (2d) 651.

In our opinion, the correct approach to the valuation question with which we are confronted in this case, is somewhere between the respective arguments offered by the railroad company and by the city. We are strongly impressed by the argument of the Attorney-General, who concedes that there was some decline in the value of Hudson River waterfront property from 1930 to 1940, but contends that the decline

in the value of property available and in use for railroad terminal purposes, such as that involved in this case, was "moderate," from a long range point of view We are satisfied that the State Tax Commissioner has reasonably reflected any decline in the value of this property, by the two successive ten per cent. reductions which he made in the assessments of the waterfront tracts (comprising 93 per cent. of the total assessed valuations of the Jersey City terminal), one in 1936 and the other in 1939.

Many sales were cited by the real estate experts on both sides. The experts for the railroad companies ignored entirely acquisitions by the Pennsylvania Railroad Company to enlarge its main terminal one-half mile from the property under appeal, at prices many times the highest rate of assessed valuation of the Central property. They laid paramount emphasis on a recent sale from Jersey City to the army of 300 acres. of entirely undeveloped lands, mostly under water, on New York Bay, sold at $6,000 per acre. This property was taken over by the city for unpaid taxes of its prior owner, Lehigh Valley Railroad Company, and the sale price to the army was in approximately the amount of the unpaid taxes, exclusive of penalties. A sale under such circumstances does not qualify as an entirely satisfactory criterion of the true value of property. See *Plainfield* v. *State Board of Tax Appeals,* 127 *N. J. L.* 5 (at *p.* 6) ; 20 *Atl. Rep.* (*2d*) 651; *City Holding Co.* v. *State Board of Tax Appeals,* 127 *N. J. L.* 168 (at *p.* 169) ; 21 *Atl. Rep.* (*2d*) 289. It is also shown by the testimony of Mr. Focht and Mr. Mantell that the property sold to the army does not compare with that under appeal from the standpoint of availability of railroad terminal purposes.

We have studied all the sales cited carefully, particularly the army sale mentioned above, and that from Delaware, Lackawanna and Western Railroad Co. to General Foods Co., in Hoboken, in 1938. The latter was obviously a transaction in which the seller was primarily interested in the freight tonnage to be received from a very large industrial plant to be constructed by the purchaser, rather than the sales price. This was corroborated by the testimony of the land and tax

agent of the Delaware, Lackawanna and Western Railroad Co., Mr. Eastburn, who testified that before his department of the railroad company had anything to do with this transaction, the General Foods Co. was investigated and found to be a satisfactory purchaser by the industrial or traffic department of the railroad company. Moreover, the property sold was a small, isolated tract, of irregular shape, having only two-fifths of its backland width on the waterfront. It has, furthermore, no backland sufficient to permit of its development for railroad terminal purposes, similar to the property under appeal, nor sufficient depth between the physical bulkhead and the pierhead line to permit of development for maximum steamship uses, as contrasted with the situation at Parcel No. 1 under appeal, which has both sufficient supporting backland and distance to the pierhead line for either railroad waterfront, or the highest type of steamship development.

All of the sales, however, must be taken with an eye both to the circumstances motivating the seller and purchaser and the possible effect of such motives upon the sales prices, *Curley* v. *Jersey City*, 83 *N. J. L.* 760; 85 *Atl. Rep.* 197, and to the physical comparison between the property sold and that under appeal, considering location, shape, size, extent of waterfront, upland, water depth, assemblage and consolidation of lands, and general availability for railroad purposes. For example, we have not taken the Exchange Place terminal acquisitions of the Pennsylvania Railroad Company at their face value, reflecting prices of upwards of $250,000 per acre. The location is more valuable than the subject property, some of the properties contained structures, and the railroad company was not a willing purchaser. But we cannot ignore these sales entirely, even though they were made some time ago. They represent the only fairly recent recorded purchases by a railroad company of lands to be incorporated into a Hudson River waterfront terminal.

Because of the utter lack of any sales perfectly applicable in all particulars to the property under appeal, it seems necessary to accord some weight, but in greatly varying degrees, to all of the sales on the Hudson River and New York Bay.

The Deputy State Tax Commissioner, in charge of railroad tax assessments, Mr. Louis Focht, testified in defense of the assessments. He satisfies us, from the manner of his testimony, both on direct and cross-examination, and upon close questioning by the president of the Board at the hearing, that his assessments are and have been reasonable and sound, and based upon a consideration of all proper factors bearing upon the true value of the property, including sales. Mr. Focht showed a particularly careful examination, on primary review of the 1943 assessments, of all of the sales which have taken place in the vicinity of the property under appeal. It seems to us significant that the two separate reductions of ten per cent. which he put into effect on the waterfront properties in 1936 and in 1939, have not been disturbed since that time, despite the greatly increased use and profitableness of railroad property generally since those dates. It is obvious that if the valuations made in 1939 were not excessive, and we have so held in May, 1942, *City of Jersey City* v. *Thayer Martin,* 20 *N. J. Mis. R.* 283; 26 *Atl. Rep.* (*2d*) 733, they should not be considered excessive as of the assessing date for the year 1943. Most of the experts on both sides agree that there was no substantial change in the condition or value of the property between January 1st, 1938, and January 1st, 1942.

We are bound to attach great weight to the point of view of the State Tax Commissioner, since the statute expressly provides that he may use his "personal knowledge and judgment as to the value of any property which he is required to assess, upon original assessment, or upon review thereof." *R. S.* 54:29A–67; *N. J. S. A.* 54:29A–67. Assessments made by him should not be interfered with "except for palpable error." *Central Railroad Co.* v. *State Board of Assessors,* 49 *N. J. L.* 1 (at *p.* 9) ; 7 *Atl. Rep.* 306; *United New Jersey Railroad and Canal Co.* v. *State Board of Taxes and Assessments,* 100 *N. J. L.* 131 (at *p.* 136) ; 125 *Atl. Rep.* 335; *Long Dock Co.* v. *State Board of Assessors,* 86 *N. J. L.* 592; 92 *Atl. Rep.* 439.

This Board has for many years past been familiar with the administration of railroad tax assessments under the direction

of Mr. Focht, who has done this work since 1898, and we find no basis in the present case, to disagree with what the Supreme Court of this state said concerning him in *Central Railroad Co.* v. *Thayer Martin*, 114 *N. J. L.* 69 (at *p.* 73); 175 *Atl. Rep.* 637 (at *p.* 639), as follows:

"Mr. Louis Focht, a civil engineer since 1884, has been identified with the branch of the state department in charge of the detail work incident to the making of the assessments since 1898. He is the chief engineer of the Division of Railroad Valuations and Taxes. He was formerly employed by the Lehigh Valley Railroad Company of New Jersey for about sixteen years as a division engineer. He has walked every foot of railroad in this state. He was called and testified as a witness for the prosecutors and respondents. He said that the method employed in the making of the instant assessments, and herein complained of, is the method that has been employed in this state since 1884."

The question arises as to what weight or influence should be attached by the Board, in deciding this case, to our decision in the 1942 case. *Appeal of Pitney et al.*, 20 *N. J. Mis. R.* 448; 28 *Atl. Rep.* (2d) 660. The circumstances under which the 1942 case was heard and decided show that very little weight, if any, can be given to it as a precedent for the valuation issues in this case.

The circumstances in the 1942 case were as as follows:

The appeal of the trustees of the Central Railroad Company was the only tax appeal filed by any railroad company questioning property valuations for 1942. It was filed in due course on June 15th, 1942. As in the present case, there was also a Jersey City appeal for an increase in the valuations. Pursuant to its custom of many years past, the Board did not begin the immediate hearing of the appeal, but set the case down for the fall, 1942, calendar, together with several other railroad franchise appeals.

On July 1st, 1942, the term of office of the then president expired, and the Governor appointed the present president of the Board as his successor. The matter of the appeal of the Central Railroad Company and the appeal for an increase of the valuations of the same second class property by the

City of Jersey City were put on the calendar for September 15th, 1942. On that day, the Board fixed Monday, September 21st, 1942, as the date for the commencement of the hearings. The hearings did actually begin on that day, and from thence until November 4th, 1942, when the opinion of the president was submitted to the Board, the hearing and handling of this case was exclusively by the president of the Board.

At the very outset of the hearing, the president announced that he would regard himself as bound by the provisions of section 34 of the Railroad Tax Act, *Pamph. L.* 1941, *p.* 785; *N. J. S. A.* 54:29A–34, to conclude the hearing of the case on or before October 15th, and the case was heard daily from September 21st to and including October 15th. We have inspected the record of the hearing, and we find that with the exception of part of the afternoon session of October 15th, all of the trial days were taken up by direct or rebuttal proof offered by the petitioners. The Deputy Attorney-General had no time, on October 15th, to do more than offer the testimony of Mr. Focht as to the general methods employed in the assessment of railroad property. The Attorney-General's deputy was urged by the president of the Board at the hearing to expedite his examination, so that counsel for the City of Jersey City could put in certain remaining proofs, not yet offered by it, before the close of the day. We are satisfied that the advance notice by the president of the closing of the hearing on October 15th and its actual closing on that day effectively deprived the Attorney-General of the opportunity to offer a full and adequate defense of the assessments challenged by the appeals. It appears, moreover, that it was questionable, as a matter of law, whether the Board was legally foreclosed of the right to continue hearings in the case beyond October 15th, if necessary to the full, fair and reasonable conduct of the hearing, or prevented from taking as much time thereafter as was necessary to enable all of the members of the Board fully and intelligently to weigh the report and recommendations of the president, and form an independent determination as to the soundness thereof. See *Grobarz* v. *Slayton*, 130 *N. J. L.* 597; 33 *Atl.*

*Rep.* (*2d*) 697; *Redcay* v. *State Board of Education,* 128 *N. J. L.* 281; 25 *Atl. Rep.* (*2d*) 632; *City of Jersey City* v. *Hudson County Board of Taxation and Moskovitz,* 130 *N. J. L.* 309; 32 *Atl. Rep.* (*2d*) 594.

On November 4th, 1942, at a regular meeting of the Board, the president submitted to the members of the Board a written opinion which he had prepared, disposing of the petitions of appeal by fixing very substantial reductions in the assessed valuations of both second class and main stem property of the Central Railroad Company in the cities of Jersey City and Bayonne. The Board was advised by the president, that, as a matter of law, the Board was required to certify its decision no later than the next day, November 5th, and that it was expeditious that the judgments should be signed that day, November 4th. The members had no choice but to concur in the conclusion of the president that the November 5th date was mandatory. Over 2,000 pages of testimony had been taken, many exhibits were introduced in evidence, and briefs had been filed by the railroad company, the City of Jersey City and by the Attorney-General. It was impossible for any of the members of the Board on November 4th or 5th to read the testimony and briefs and to examine the exhibits so as to form an independent judgment whether the conclusions and recommendations of the president as stated in his opinion were justified.

The situation with respect to the present case is entirely different. The hearings began on May 19th, 1943, and concluded in July. At the suggestion of the president, each of the members of the Board has read in full all of the testimony taken in the current case. Each of the members of the Board, furthermore, has been furnished with and has examined carefully, briefs of counsel aggregating almost 400 pages. The full Board has heard oral argument over a period of two days.

A considerable amount of important proof, including support of the assessments by real estate and other experts, was offered by the Attorney-General in the present case, none of which apparently the Attorney-General had opportunity of adducing in the 1942 case. The Board now has a thorough

insight into the tax history of this property and has had an opportunity to make a full examination of all of the various sales testified to as well as the other evidence bearing on the question of the true value of these properties. Each annual assessment for taxation is a separate and distinct thing. *United New Jersey Railroad and Canal Co.* v. *State Board of Taxes and Assessments,* 103 *N. J. L.* 33; 134 *Atl. Rep.* 669. We have concluded that our determination of the present case should in no way be influenced by the action of the Board in the 1942 case.

It is our conclusion, after a careful consideration of all of the proofs, the opinions of the witnesses, the sales of property, and of the tax history of the property under appeal, that the assessments of second class lands for the year 1943 should not be disturbed, and they are therefore affirmed.

With respect to the appeal of the railroad company on main stem, our conclusion is again that the assessments made by the State Tax Commissioner should be affirmed. The railroad company offered the testimony of two real estate experts to support its claim for a reduction in the assessed value of these properties. But it is clear that the approach taken by the experts is erroneous, and can be given little, if any, weight at all. These experts conceded that their appraisals were made in entire disregard of the usefulness or use of the lands in the main stem for railroad purposes. They said that they had taken each individual parcel of main stem assessed, and considered only what it would bring on the open market if the railroad discontinued operations, removed the tracks, and sought to market the property for general industrial or commercial purposes. The main stem is the right-of-way of the railroad. Some of it is in deep cuts, and some on fills of varying levels above the surrounding grade of land. Each of these separately assessed tracts of main stem land would be worth very little in its present condition for purposes other than that of a going railroad company. It is true that the property must be assessed in its actual physical condition, as held by the owner. *Stevens Institute* v. *State Board of Taxes and Assessments,* 105 *N. J. L.* 99; 143 *Atl. Rep.* 356. At the same time, if the property has an obvious value for a

particular purpose, such as for the right-of-way of a going railroad company, that factor of value may not arbitrarily be disregarded by the assessor. This is well established. *Central Railroad Co.* v. *State Board of Assessors,* 49 *N. J. L.* 1 (at *p. 5*); 7 *Atl. Rep.* 306. See, also, *Central Railroad Co.* v. *Thayer Martin,* 114 *N. J. L.* 69 (at *p. 75*); 175 *Atl. Rep.* 637.

The state has introduced the testimony of real estate experts who appraised the main stem lands under appeal at considerably in excess of the assessment. We note also that the State Tax Commissioner has heretofore voluntarily made very substantial reductions of the main stem lands, particularly in the case of the Newark and New York branch, where the valuations have been reduced by the Commissioner approximately fifty per cent., between 1938 and 1942. Our conclusion is that there is no showing warranting any reduction in the 1943 assessed value of main stem lands and the assessments thereof will be affirmed.

With respect to the appeal by the City of Jersey City on structures, the proofs offered are based exclusively upon asserted reproduction cost minus depreciation, as of the assessing date, and are not shown to be connected with any proof of the true or market value of these structures as of the assessing date. While reproduction cost minus depreciation may be some evidence of true value, under certain circumstances, we agree with counsel for the railroad company that the very high costs for material and labor which existed on the assessing date do not justify a conclusion that the assessed value of these structures was too low. *Central Railroad Co.* v. *State Board,* 49 *N. J. L.* 1 (at *p. 5*); 7 *Atl. Rep.* 306, and *Turnley* v. *City of Elizabeth,* 76 *N. J. L.* 42; 68 *Atl. Rep.* 1094. It is also apparent that full weight cannot be given to the conclusions of the city witness on structures, as he has almost entirely disregarded the factor of obsolescence. Most of these structures have been assessed at the same figure without depreciation for a number of years past by the State Tax Commissioner. We are unable to conclude, from the proof offered by the city, that the assessments are at less than the true value of these structures on the assessing date.

A claim has been made by the railroad company with respect to the assessment as part of the main stem of certain overhead highway bridges on the ground that such property is not used for railroad purposes. If this contention were sustained, the property would then become assessable locally by the taxing districts instead of by the state. We have reconsidered our holding in the *Appeal of Pitney et al.*, 20 *N. J. Mis. R.* 448; 28 *Atl. Rep.* (*2d*) 660, the 1942 appeal by the same railroad petitioner. On the recommendation of the president, we held in that case that these bridges are not property used for railroad purposes and were therefore not taxable by the state. We are now of the opinion that that ruling was in error. The testimony is to the effect that such bridges have always been assessed by the state as property used for railroad purposes. There is a great deal of property of this character throughout the state. When the legislature revised the Railroad Tax Law in 1941, *Pamph. L.* 1941, *ch.* 291; *N. J. S. A.* 54:29A–1, *et seq.*, it failed to make any change whatever in the statutory definition of the various classes of physical railroad property to be assessed by the State Tax Commissioner, and therefore, the long continued practical construction of the law by the State Tax Commissioner to the effect that these bridges are property used for railroad purposes, must be given great weight. *Central Railroad Company of New Jersey* v. *Thayer Martin*, 114 *N. J. L.* 69; 175 *Atl. Rep.* 637. These bridges are essential to the operation of the railroad. Without them there would be obstructions of the right-of-way, by public streets and highways. The assessment of these bridges as main stem will therefore not be disturbed.

Claims have also been made by the railroad company for the exemption of the cost of grade crossing eliminations at Elizabethport, Somerville, Perth Amboy and Cranford. We see no reason why the determination of these claims should not be the same in the present case as in the 1942 case, *Appeal of Pitney et al., supra.* Accordingly, the request for the exemption of grade crossing eliminations will be denied.

Finally, we have before us a contention by the railroad company that the assessment made by the State Tax Com-

missioner lacks legal validity because of an irregularity in the making of the primary assessment. In order to understand the claim made, it is necessary to review the provisions of the statute concerning the procedure in the making of assessments on railroad property by the State Tax Commissioner.

On or before November 1st in each year, the State Tax Commissioner is required to determine the true value, as of the preceding January 1st, of all property used for railroad purposes, in four statutory classes. No later than December 10th, the Commissioner is required to deliver a detailed statement of his valuations to each taxpayer, and no later than December 15th, he is directed to certify the value of Class II property in each taxing district to the assessors in such districts in which the property is situated. R. S. 54:29A–17; N. J. S. A. 54:29A–17. Any taxpayer, or the Attorney-General on behalf of the state and of the taxing districts, may file a petition for review of such valuations with the State Tax Commissioner on or before the second Monday of January following. The Commissioner is directed to conduct a hearing, review the valuations complained of, and correct the same as shall appear just, before the 1st day of April. He is also required, before the 1st day of April, to certify to each county board of taxation, the value of Class II property situated in each taxing district in the county, as corrected on such review. R. S. 54:29A–18; N. J. S. A. 54:29A–18.

On or before April 10th in each year, the Commissioner is directed to compute the tax and assess the amount thereof to each taxpayer according to his valuations as corrected. R. S. 54:29A–19; N. J. S. A. 54:29A–19. Within ten days thereafter, he is directed to serve a copy of the assessment on the taxpayer. R. S. 54:29A–21; N. J. S. A. 54:29A–21.

The facts pertaining to the making of the 1943 assessment on the property of the Central Railroad Company of New Jersey, as shown by the proofs in this case, were as follows: The primary valuation was made on November 16th, 1942, in the sum of $70,943,696. As in the case of assessments of railroad property generally, the detailed work of formulat-

ing and setting up the valuation figures on the property of the petitioners was done by the Railroad Tax Division of the State Tax Department, under the direction of Mr. Focht. Conceiving that he was bound by law to allow in the making of the 1943 assessments the same reductions allowed by this Board in the 1942 appeal of this railroad company, the circumstances of which have been set out fully hereinabove, Mr. Focht prepared the 1943 primary assessment on that basis without specifically informing the State Tax Commissioner that that had been done. The State Tax Commissioner testified that he was not made aware of this fact until sometime in January, 1943. In the meantime, the Commissioner consulted with Assistant Attorney-General Walsh, who had tried the 1942 case before this Board, as well as with Mr. Focht, and it was decided by these officials that the Attorney-General should be requested to prosecute a writ of review of the judgment of the Board in the 1942 case. An application for such review, supported by the affidavit of Mr. Focht, was duly made, and a writ of *certiorari* was allowed the Attorney-General on January 16th, 1943. Subsequent to the conference of the State Tax Commissioner and the Assistant Attorney-General, the former was made aware, as he testified in the present case, that the primary assessment against the Central Railroad Company of New Jersey for 1943 was based upon the reductions allowed by this Board in the 1942 case. He thereupon wrote to the Attorney-General as follows:

"January 19, 1943.

Hon. David T. Wilentz,
Attorney-General,
State House,
Trenton, New Jersey.
Dear Sir:

The primary valuations of property in railroad use of the Central Railroad Company of New Jersey, for 1943 assessment purposes, are those valuations fixed by the judgment of the State Board of Tax Appeals in its disposition of the appeal from the 1942 assessment. This procedure has been followed upon the assumption that the judgment of the State

Board of Tax Appeals was controlling as to valuations not only for 1942, but for 1943 and succeeding years.

The question now arises whether that assumption is correct, or whether instead the valuations for 1943 should represent the judgment of the State Tax Commissioner, unaffected by the referred to judgment of the State Board of Tax Appeals.

It is respectfully requested that you advise me regarding this problem.

Very respectfully,

(Sig. WILLIAM D. KELLY.
WILLIAM D. KELLY,
*State Tax Commissioner.*

S"

The Attorney-General responded as follows:

"January 22, 1943.

Hon. William D. Kelly,
State Tax Commissioner,
State House,
Trenton, New Jersey.
My dear Commissioner:

I have your letter of January 19, 1943, regarding the primary valuations assessed for the year 1943 against property in railroad use of the Central Railroad Company of New Jersey.

In response to your inquiry, it is my advice to you that the judgment of the State Board of Tax Appeals in reducing the 1942 assessments made by you against the property of that company is not controlling upon you in the making of the 1943 valuations, and that you are not only free to make your 1943 valuations in accordance with your judgment as to the value of these properties as of the assessing date for said year, but you are, moreover, under a duty so to do. Each assessment of property for taxation is a separate entity, distinct from the assessments of the previous or subsequent years. *United New Jersey Railroad and Canal Co.* v. *State Board of Taxes and Assessments,* 101 *N. J. L.* 303 [128 *Atl. Rep.* 427]. The judgment of the State Board controls only as to the particular year under review.

Moreover, my office has heretofore advised with you concerning the illegality and error in the action of the State Board of Tax Appeals in reducing these valuations and in eliminating certain specific types of property from the assessments, and in consequence thereof it was decided to file *certiorari* proceedings for the purpose of obtaining a court review of the said actions of the State Board of Tax Appeals. The decision to apply for this review was concurred in by your office and was supported by the affidavit of Mr. Focht.

A writ of *certiorari* has actually been allowed the State on my application by Mr. Justice Porter on January 16, 1943, and this proceeding will be vigorously prosecuted to the end that the original valuations made by your department on the property of this company for the year 1942 may be sustained and the ruling of the State Board of Tax Appeals reversed.

I accordingly advise you that in my opinion you should continue to exercise your own judgment as to the making of the valuations in 1943, and in succeeding years, on all railroad property until such time as the courts conclude our *certiorari* proceedings and thereby advise us as to whether or not the position which has been taken by the State Board of Tax Appeals is correct.

It would be my advice that upon the remaking of the 1943 valuations as dictated by the Commissioner's judgment the taxpayer be given immediate notice of such action and that an early date be set for hearing any objections which the taxpayer may desire to offer thereto, so that the final assessments for the year 1943 against the property of this company may be completed within the time fixed for the making of final 1943 valuations against all of the companies, to wit, on or before April 1, 1943.

I should appreciate your courtesy in advising me of any action taken so that my office may be represented at any hearing held and be prepared to defend the legality of the action taken.

Respectfully yours,

(Signed) DAVID T. WILENTZ.

DAVID T. WILENTZ,

*Attorney-General."*

Thereupon, on February 4th, 1943, the State Tax Commissioner revalued the property of the petitioners, without regard to the State Board judgment in the 1942 case, at $79,371,391. At the same time, he fixed a date for the hearing of any objections by the taxpayer to the legality of the action taken and for the submission of any testimony bearing upon the propriety of the valuations made, on the merits thereof. In response to the notice thereof, the railroad company appeared by its counsel and tax agent, and offered evidence with respect to the excessiveness of the valuations, and also presented legal argument by way of objection to the making of the corrected primary assessment. Subsequently, the Commissioner disposed of the showing made on behalf of the railroad company by dismissing its legal objections to the correction of the primary assessment, but allowing certain reductions in the valuations, based upon the evidence submitted. As required by the statute, the State Tax Commissioner thereafter made a final valuation and assessment for the year 1943, in the sum of $78,187,344. The railroad petitioner does not claim that this final assessment was not made regularly and within the statutory time.

Contrary to the dissenting opinion which has been filed by the president in this case, the instant petition of appeal to this Board is specifically stated to be "against the valuation, assessment and taxation of said property used for railroad purposes in the State of New Jersey for the year 1943 as finally determined by the State Tax Commissioner in the amount of $78,187,344 * * *," *i. e.*, the final assessment, and not, as stated in said dissenting opinion, from the corrected primary assessment of February 4th, 1943, in the sum of $79,371,391.

The State Tax Commissioner testified that his revision of the primary assessment of November 16th, 1942, was based upon the fact that he was in disagreement with the action of the Board in reducing the 1942 valuations and that it would be entirely inconsistent for him to recommend proceedings by the Attorney-General for the reversal thereof in the Supreme Court and nevertheless, at the same time, apply such reductions in the making of the 1943 valuations. **Mr.** Focht, moreover, testified in the present hearing and posi-

tively affirmed his personal disagreement with the soundness of the determinations of the Board in the 1942 case, and reaffirmed his opinion as to the correctness of the 1942 assessment as originally made, as well as of the final assessment for the year 1943.

The question this presented is as to whether the primary valuation, inadvertently signed by the State Tax Commissioner under a mistaken impression as to the contents thereof, is forever barred from correction by the Commissioner or by this Board, upon appeal, unless the Attorney-General files a petition for review thereof with the State Tax Commissioner on or before the second Monday of January, as he may do under the statute. *R. S.* 54:29A–18; *N. J. S. A.* 54:29A–18. We find that such is not the law. Taken to its logical conclusion, an acceptance of the argument of the railroad company would lead to the conclusion that there is no valid assessment against the railroad company for the year 1943 whatsoever, thereby resulting in a complete escape of this taxpayer from any taxation for that year. This is for the reason that the original primary assessment, which petitioners claim is the only lawful one, was itself made out of time, the date thereof being November 16th, 1942, while the statutory requirement was that it be made on or before November 1st, 1942.

In our opinion, the question presented is controlled by the provisions of *R. S.* 54:4–58 and *R. S.* 54:4–59; *N. J. S. A.* 54:4–58 and *N. J. S. A.* 54:4–59. These sections read as follows:

"No tax, assessment or water rate imposed or levied in this state shall be set aside or reversed in any action, suit or proceeding for any irregularity or defect in form or illegality in assessing, laying or levying any such tax, assessment or water rate, or in the proceeding for its collection if the person against whom or the property upon which it is assessed or laid is, in fact, liable to taxation, assessment, or imposition of the water rate, in respect to the purposes for which the tax, assessment or rate is levied, assessed or laid."

"The court in which any action, suit or proceeding is or shall be pending to review any such tax, assessment or water

rate shall amend all irregularities, errors or defects, and may if necessary ascertain and determine the sum for which the person or property was legally liable and by order or decree fix the amount thereof. The sum so fixed shall be the amount of tax, assessment or water rate for which the person or property shall be liable."

This Board has held that it constitutes a "court" within the meaning of section 54:4–59. *Duke Power Co.* v. *Hillsborough,* 20 *N. J. Mis. R.* 240; 26 *Atl. Rep.* (2d) 713 (reversed on another point. *Duke Power Co.* v. *State Board of Tax Appeals,* 129 *N. J. L.* 449; 30 *Atl. Rep.* (2d) 416).

The purpose of the original act, upon which *R. S.* 54:4–58 and 54:4–59; *N. J. S. A.* 54:4–58 and 54:4–59, are based, was stated in the early case of *Conover* v. *Honce,* 46 *N. J. L.* 347, as follows:

"As I read that act, its effect is to destroy, root and branch, the power to defeat such a proceeding except upon a meritorious ground. If the person or the property be not taxable, the processes of appeal and *certiorari* retain their usual efficacy, but, touching forms and irregularities of procedure, they have been stripped of all force whatever. In fact, the statute, in very terms, declares that such shall be its effect. * * * The expressed purpose of this law, therefore, is to prevent, for the future, the frustration of taxation on the ground of erroneous procedure. * * *"

In *Dodge* v. *Love,* 47 *N. J. L.* 436; 2 *Atl. Rep.* 810, 811, it was said, as to the same statute:

"The act is remedial and *should be liberally construed to embrace within its scope all the steps necessarily taken in levying the public revenues.* That such was the legislative purpose is manifested by the fact that its operation is expressly extended to the proceedings for the collection as well as for the assessment of taxes. It could not have been intended to exclude the intermediate steps between the initial and final procedure."

In *Saunders* v. *Morris,* 48 *N. J. L.* 99; 2 *Atl. Rep.* 666, the Supreme Court held that certain taxes under review had been improperly assessed but nevertheless stated:

"But it does not thence follow that the court should set

them aside. There is nothing in the state of the case to indicate, nor does the prosecutor assert, that he was not liable to taxation in the district when these taxes were levied, or that they exceed the sums justly assessable against him. Under such circumstances, the general act respecting taxes, assessments and water rents, approved March 23d, 1881 (*Pamph. L., p.* 194 [*N. J. S. A.* 54:4–48 to 54:4–60]), prohibits the court from annulling taxes merely because of illegality in the assessment of the same, and make it our duty to see that the complaining taxpayer bears his fair share of the common burden."

All of the foregoing cases were cited and the rule set forth therein applied by the Court of Errors and Appeals as recently as 1941 in the case of *Ridgewood Elks Holding Corp.* v. *Ridgewood,* 127 *N. J. L.* 295; 22 *Atl. Rep.* (*2d*) 266.

We therefore find that such irregularity as took place in the earlier stages of the making of the assessment under appeal can and should have no influence upon our consideration of the validity and regularity of the final assessment. We further find that the final assessment, to which the appeal of the railroad company is, in terms, directed, was made within the statutory time and under circumstances which have in no way prejudiced the petitioners in the making of a fair and full attack upon the merits of the assessed valuations, in the same manner and with as full freedom as though the assessment of November 16th, 1942, had been in the sum fixed by the revised primary assessment of February 4th, 1943. If the irregularities are deemed to require correction by this Board, then we herewith make such correction, in obedience to the requirements of *R. S.* 54:4–58 and *R. S.* 54:4–59; *N. J. S. A.* 54:4–58 and *N. J. S. A.* 54:4–59, to the end that our conclusions with respect to the merits of these valuations may be made effective.

Determination of the questions involved in the appeal of the City of Jersey City for reclassification of main stem properties will be reserved for later consideration and determination.

Judgments will be entered in accordance with the foregoing conclusions.

WAESCHE, President. (Dissenting.) The complaint filed in these appeals by the trustees of the property of The Central Railroad Company of New Jersey (hereinafter referred to as The Central Railroad) is from the assessment of the 1943 tax computed on the valuation of the property used for railroad purposes as re-determined and finally fixed by the State Tax Commissioner on February 4th, 1943. The property of The Central Railroad used for railroad purposes in the State of New Jersey was valued by the State Tax Commissioner on February 4th, 1943, in the total amount of $78,187,344. The trustees maintain that the true value of said property is not in excess of $50,000,000. On the hearing, the testimony on the value of the land in railroad use was confined to the land of The Central Railroad located in Jersey City and Bayonne.

The State Tax Commissioner originally valued and assessed the property of The Central Railroad in railroad use in New Jersey as of January 1st, 1942, in November, 1942, in the total amount of $70,943,696, and he certified this value to The Central Railroad and to the County Boards of Taxation on December 10th, 1942. On January 27th, 1943, he canceled the valuation made in November, 1942, and re-valued the property on February 4th, 1943.

The valuations and assessments levied on the land in Jersey City which are under review in these appeals cover the same parcels of land that were before this Board on appeal from the State Tax Commissioner's assessments of taxes for the year 1942. The decision of this Board in the 1942 case was rendered on November 4th, 1942, and the opinion is printed in 20 *N. J. Mis. R.* 448; 28 *Atl. Rep.* (*2d*) 660.

The complaint filed in these appeals by Jersey City complains against the valuations on which the tax for the year 1943 was computed by the State Tax Commissioner and assessed on the same land covered by the appeal of The Central Railroad, and also some additional properties of The Central Railroad in railroad use located in Jersey City. The petitioner, Jersey City, asks for an increase over the valuations fixed by the State Tax Commissioner.

By consent the two appeals were heard together.

The land under appeal lying within the Jersey City terminal of The Central Railroad is described as to its size, location, condition and use in the opinion of this Board in the 1942 appeal, which is printed in 20 *N. J. Mis. R.* 448; 28 *Atl. Rep.* (*2d*) 660. I refer to the description of the property in that opinion rather than repeat it here; in fact, this opinion will supplement the opinion in the 1942 case, and the two opinions should be read together, as my opinion in these 1943 appeals. The character, condition and use of the property on January 1st, 1941, were the same as on January 1st, 1942, the respective assessing dates for the taxing years 1942 and 1943.

The trustees of The Central Railroad were appointed by the District Court of the United States for the District of New Jersey on November 28th, 1939, pursuant to the provisions of section 77 of the Bankruptcy Act, 11 *U. S. C. A.*, § 205.

On October 18th, 1939, The Central Railroad owed matured and unpaid interest for the year 1939 on its general mortgage bonds in the amount of $1,536,867.50. On October 18th, 1939, there was due the State of New Jersey for unpaid taxes for the years 1932 to 1938, both inclusive, the principal amount of $11,651,081.86; and there was also due and unpaid local taxes in the principal amount of $2,339,173. On December 1st, 1939, taxes levied by the State of New Jersey for the year 1939 came due in the amount of $3,415,922.05. To meet these aforesaid obligations, which total the sum of $18,943,044.41, The Central Railroad had an available cash balance on October 18th, 1939, of only $4,822,781.

Each year from 1935 to 1940, both inclusive, the income account of The Central Railroad from the operation of all its properties showed a large deficit after charging off the payment of New Jersey state taxes and interest on indebtedness. The net corporate income of The Central Railroad for the year 1941, as reported to the Interstate Commerce Commission, was $539,306; and for the year 1942, due to the war, the net corporate income as reported to the Interstate Commerce Commission was $5,046,665.

The United States Supreme Court held in the case of *Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 *U. S.* 523; 63 *S. Ct.* 727, 739; 87 *L. Ed.* ——, that the earning power is the primary criterion of the value to be assigned to the property of a railroad company in a reorganization proceeding under the Bankruptcy Act. In its opinion the court said:

"Late in 1939 the Commission (I. C. C.) had occasion to say, 'We know from past experience that the upswing in business which war brings is temporary and likely to be followed by an aftermath in which conditions may be worse than before.' 53d Annual Report, page 5. * * * We cannot assume that the figures of war earnings could serve as a reliable criterion for that 'indefinite future.' As some of the bondholders point out, the bulge of war earnings *per se* is unreliable for use as a norm unless history is to be ignored."

The par value of The Central Railroad stock issued and outstanding at the present time is $27,436,800, and the par value of its bonded indebtedness is $50,002,277.67. If the property leased by The Central Railroad from the Lehigh Coal and Navigation Company is valued at $46,688,140, which figure is arrived at by a straight capitalization at five per cent. of the rent of $2,334,407 paid for this leased property for the year 1939, and if to that capitalized value is added the par value of The Central Railroad stock and bonded indebtedness, a figure of $124,127,217 is arrived at. This sum might be said to fairly represent the total investment in all the properties owned and operated by The Central Railroad. The Bureau of Valuation of the Interstate Commerce Commission valued the property of The Central Railroad as of January 1st, 1937, at the total amount of $164,077,313. By taking either figure, that is, either $124,127,217 or $164,077,313, as representing the total investment in The Central Railroad, the profits for the year 1941 represented a return of less than one-half of one per cent. on the investment; and the war profits for the year 1942 represented a return of only four per cent. on the investment. As previously pointed out, for six years prior to 1941, The Central Railroad operated at a deficit.

As mentioned above, The Central Railroad leases from the Lehigh Coal and Navigation Company substantially all of the railroad lines it operates west of the Delaware River; that is, the lines between Wilkes-Barre, Pennsylvania, and Phillipsburg, New Jersey.

In January, 1940, the trustees of The Central Railroad engaged Mr. William Wyer to make a study of the operating revenues and expenses of the lines in Pennsylvania, in order that they might determine whether or not to continue the lease of these properties. Mr. Wyer's appointment by the trustees was authorized by order of the United States District Court dated January 29th, 1940.

Mr. Wyer is a graduate of Yale College and Massachusetts Institute of Technology. He also studied at the Harvard Graduate School of Business Administration, where he took all of the railroad courses offered by that school. For two years he studied law at Cleveland Law School. While in the army as first lieutenant during the first Word War, he was engaged in the construction of the government-owned railroad serving Camp Humphries, Virginia, and, later, he was occupied in helping to operate this railroad. After leaving the army, he was employed by the United States Railroad Administration. He resigned his position with the government to become assistant superintendent of transportation with the Norfolk Southern Railroad. In 1921 he accepted a position as statistician to the president of the Denver and Rio Grande Western Railroad, and, later, he became operating assistant to the president. In 1929, he was appointed first assistant to the board of directors of the Missouri Pacific Railroad and, later, he became its secretary and treasurer. He left the Missouri Pacific in 1938 and went into business for himself. Since 1938, he has been engaged to make extensive studies of railroad operations in connection with the valuation of railroad properties, and also in connection with plans for reorganization. He has made such studies for the New York, New Haven and Hartford; the Erie; Delaware, Lackawanna and Western; New York, Ontario and Western; New York, Susquehanna and Western; Seaboard Air Line; Florida East Coast; Central of Georgia; Chicago and North-

western; Denver and Rio Grande Western; Chicago and Alton; The Central Railroad of New Jersey, and several other railroads.

Mr. Wyer made a study of the income of The Central Railroad for the years 1934 to 1942, inclusive, for the purpose of determining what part of that income was earned by the operations over the lines in Pennsylvania leased from the Lehigh Coal and Navigation Company. In making this study, he also had to determine the income from the operation of The Central Railroad lines in New Jersey separate from the lines under lease in Pennsylvania. His original study was confined to the year 1939. His report for the year 1939 was submitted to the trustees of The Central Railroad in May, 1941, and they, in turn, submitted it to the United States District Court. This report was marked in evidence in this case as *Exhibit CR-43*, and is known as a segregation study.

According to the study made by Mr. Wyer, the New Jersey lines of The Central Railroad were operated at a deficit for the years 1934 to 1940, inclusive. According to the results of Mr. Wyer's studies, it would appear obvious that under normal conditions the Jersey City terminal and waterfront facilities of The Central Railroad, in so far as they are used for railroad purposes in connection with the operation of the New Jersey lines of The Central Railroad, are part of an unprofitable railroad operation.

Mr. Wyer also made a study to determine the reasons for the losses suffered by The Central Railroad in the movement of traffic over its New Jersey lines in and out of its Jersey City terminal. He found that the coal business was handled at a profit, but that all the other principal classes of business were handled at a substantial loss. He studied the movements of freight that produced the greatest volume of revenue. The most important movement of lighterage freight over The Central Railroad is between Allentown and New York. The lighterage freight that was received from the Reading and Lehigh Valley Railroads moving from Allentown to New York produced an average revenue per car, in 1939, of $49.33. Lighterage freight moving from New York

to Allentown over The Central Railroad for delivery to the Reading and Lehigh Valley Railroads at Allentown produced an average revenue per car, in 1939, of $58.16. The average cost per car for road haul between Allentown and the Jersey City terminal of The Central Railroad, in 1939, was $14.46. The average cost per car for handling this freight in the Jersey City terminal of The Central Railroad and putting it onto lighters or onto railroad cars at the Jersey City waterfront was $47.38. The average cost per car for floating this freight across the Hudson River was $16.92. Thus the total costs of the Jersey City terminal and waterfront facilities of The Central Railroad to deliver this freight from the Jersey City terminal to New York, or *vice versa*, were $64.30 per car, in 1939, which amount is in excess of the revenue per car received for transporting this freight from Allentown to New York, or *vice versa*. It is, therefore, obvious that if it were not for these large terminal and floating costs this lighterage freight could be handled at a substantial profit to The Central Railroad. The lighterage freight originating at Allentown for New York on the tracks of The Central Railroad, and from which The Central Railroad received the entire revenue, was handled at practically the same total loss per car as the lighterage freight received at Allentown from the Reading and Lehigh Valley Railroads.

Mr. Wyer analyzed other movements of freight through the Jersey City terminal, and found that the costs for handling all freight, except coal, from the Jersey City terminal to New York, or *vice versa*, exceeded all other costs for handling such freight, and were the primary cause for the large loss which resulted from the handling of such freight.

Mr. Wyer also analyzed the income account of The Central Railroad in connection with the handling of the passenger traffic through the Jersey City terminal. He found that this business is also operated at a loss and, in all probability, will continue indefinitely to be operated at a loss.

As a result of his studies, Mr. Wyer stated his conclusions as to the value of the land in the Jersey City terminal in railroad use as follows:

"I have shown in my testimony up to now that except for

coal, all of the principal classes of traffic handled at the Jersey City terminal are either without profit or are handled at a heavy loss. I have also shown that even including coal and on the freight revenue basis most favorable to the New Jersey lines, these lines as a whole operate at a deficit in normal times. Now, it therefore follows that if The Jersey Central makes any money at all on business handled at Jersey City, it must make this money on the lines in Pennsylvania, because we have shown that it makes no money as a whole on the New Jersey lines. So I have prepared this exhibit, *CR-50,* to show the distribution of the Jersey Central's freight revenue as between New Jersey and Pennsylvania in our 1942 study, and as between coal and other freight, and as between business that uses the Jersey City terminal and business that does not use the Jersey City terminal, in order to arrive at the measure of the profit which The Jersey Central makes on its Pennsylvania lines on business using the Jersey City terminal, other than coal.

"Now, you will notice in the first place that 65.6 per cent. of all of the Jersey Central's freight revenue is allocated to New Jersey, under our study. That is the last figure in the second column. So that leaves, moving over to the total figure for Pennsylvania, 34.4 per cent. of the Jersey Central's freight revenue allocable to Pennsylvania in 1942, and of that 34.4 per cent., which is found at the foot of the fourth column from the right, you will notice that 15.7 per cent. represents coal and 18.7 represents freight other than coal.

"So that at that point I have arrived at this conclusion, that on 65-6/10ths per cent. of the business handled in New Jersey, no profit is made. On the other 34-4/10ths per cent. handled in Pennsylvania, profit is made upon the coal, leaving 18-7/10ths per cent. other than coal, as representing possibilities of profit in Pennsylvania on Jersey City business.

"Now, that 18-7/10ths per cent. is the fourth figure in the fourth column from the right, and the detail of that is found to the right of that figure and the next three figures.

"Of the 18-7/10ths per cent. which the Jersey Central earns in Pennsylvania, 7-8/10ths per cent. never gets into New Jersey at all: that is, it is handled exclusively in Pennsylvania, and never crosses the river into New Jersey.

"Two per cent. of the 18-7/10ths per cent. represents business that actually finally reaches Jersey City terminal, and 8-9/10ths per cent. represents business handled in Pennsylvania but which does not come as far east as the Jersey City terminal. That is mainly business to places like Bayonne and Newark and the Perth Amboy Branch and other local points on the Jersey Central west of Jersey City.

"So you come down to this astounding fact, that of all the freight revenue of The Jersey Central Railroad, leaving out coal, which we admit is carried at a profit, only two per cent. of it is earned in Pennsylvania on business that enters the Jersey City terminal.

"Now, I have analyzed the business that enters the Jersey City terminal and showed that the lighterage and the pier freight is handled at a loss, a heavy loss, and that included in the two per cent. to the extent that it is handled in Pennsylvania, and, leaving out for the moment the interchange rate, some of which is handled at a loss and some at a profit, and assuming for the moment that that is profitable freight, over half of that two per cent. earned in Pennsylvania represents gross revenues on lighterage and pier freight, which is handled at a loss, and unquestionably a heavy loss.

"If you take out the lighterage and the pier freight which is over half of the two per cent., you have left actually less than one per cent. of the Jersey Central's total freight revenue, outside of coal, which earns any money for it in Pennsylvania on business in and out of the Jersey City terminal. I mean allocated to Pennsylvania under our method of dividing revenues between Pennsylvania and New Jersey.

"Now, then, if you go a little further, Jersey Central's total freight revenue in 1940, which is the last normal year, was about $35,900,000 and one per cent. of that would be $359,000.

"Now, that $359,000 represents the Pennsylvania gross revenue, without any deductions for expenses earned in Pennsylvania on profitable business, other than coal, which gets into Jersey City.

"In that year, in Pennsylvania, the Jersey Central carried 35 per cent. of its gross revenue down to net railway operat-

ing income, so that its net railway operating income, applying at 35 per cent. ratio on this business we are talking about, was only $125,000, and that was earned in Pennsylvania.

"Now, if therefore you gave the Jersey City terminal the benefit of all of the earnings of the railroad on Jersey City business, other than coal, in normal times, it would amount to less than $125,000 a year, and this is giving it all to Jersey City and not allocating any of it to the rest of the railroad, which helped to earn that money.

"I therefore reached the conclusion, as a result of this showing, that except for the handling of coal, Jersey City terminal is of no practical value to The Jersey Central Railroad from an earnings standpoint and that if a new coal terminal could be developed at Elizabethport, we will say, to take the coal and Jersey City terminal abandoned completely, The Jersey Central Railroad would be definitely much better off without Jersey City terminal."

It is not disputed that The Central Railroad passenger service is operated at a loss and in all probability will continue to be operated at a loss. Land devoted almost exclusively to passenger service in the Jersey City terminal is the northerly part of the terminal. This part fronts on the main channel of the Hudson River and has the greatest depth of upland extending back from the waterfront. All the real estate experts agree that this is the most valuable land in the terminal.

The Jersey City terminal of The Central Railroad comprises about 670 acres. About 40 per cent. of this area is used in connection with passenger, float bridge, lighterage and marine repair operations. According to Mr. Wyer's testimony, none of these functions produce a profit.

Mr. George H. Burgess, a witness produced by the railroad, expressed the opinion that the value of the entire tract of 670 acres for railroad purposes was not greater than 60 per cent. of its value for the highest and best use to which it could be put. He also said that in his opinion in no event would the land in the Jersey City terminal be more valuable for railroad use than it would be for some other use.

Mr. Burgess graduated from the University of Wisconsin

as a civil engineer in 1895. From 1904 to 1909, he was employed by the Erie Railroad on design and construction of terminal improvements, principally in the New York Harbor. From 1909 to 1913, he was chief engineer of the Delaware and Hudson Railroad. From 1913 to 1925, he had charge of the valuation department of the Delaware and Hudson. In 1920 he was appointed its real estate agent and had charge of the sale and leasing of land and of tax assessments. Since 1925 he has been employed by Coverdale & Colpitts, a well known firm of consulting engineers specializing in railroad work. In connection with his work with Coverdale & Colpitts, Mr. Burgess has had a great deal of experience valuing railroad properties.

Mr. Louis Forht, director and chief engineer in the division of engineering and railroad taxes of the State Tax Department, testified that about half of the railroad companies that have terminal yards in Hudson County fronting on the Hudson River or Upper New York Bay have been in bankruptcy or near bankruptcy during the past ten years.

Mr. Patrick B. McGinnis was called as a witness for the State of New Jersey by the Deputy Attorney-General of New Jersey. Mr. McGinnis is associated with the New York Stock Exchange firm of Pflugfelder, Bampton and Rust, who specialize in railroad securities, at 61 Broadway, New York City. He is a specialist on railroad securities, railroad credit, railroad valuation, and railroad capitalization and finance. According to Mr. McGinnis' testimony, 53 railroads in the United States do about 93 per cent. of the railroad business in the United States. Of these 53 railroads, about 26 are or have been in bankruptcy in recent years; about 12 were near bankruptcy; and only about 18 retained their credit standing. Those railroads that retained their credit standing did only about 38 per cent. of all the railroad business in the United States. Mr. McGinnis expressed the opinion that the rate of return on investments in industrial property other than railroads was greater than the rate of return on investments in railroad properties. He also said that the taxes due the State of New Jersey were the cause, directly or indirectly, for The Central Railroad filing its petition for reorganization

under section 77 of the Bankruptcy Act, 11 *U. S. C. A.*, § 205.

Messrs. George J. Daly and Arlyn W. Coffin, real estate experts, valued the land in these appeals at its highest and best use which they said was railroad and steamship use. They valued that part of the upland in The Central Railroad terminal which is used almost exclusively for passenger service and the waterfront facilities used for ferry slips and a few lighterage piers as the most valuable part of the terminal, because they said, it is the best adaptable to railroad use and steamship use. Not only does the evidence in these appeals strongly tend to prove that no increment of value can be attributed to the land in The Central Railroad terminal in Jersey City for railroad or steamship use but these witnesses have absolutely no knowledge of the productive or economic value of any part of the terminal in either railroad or steamship use. They have no knowledge of any sales of comparable land in railroad use or steamship use. They testified in the 1942 hearing of appeals before the State Board of Tax Appeals from the valuations and assessments levied by the State Tax Commissioner on these same properties for the tax year 1942. The values they gave in their testimony in the 1942 hearing on the land in the Jersey City terminal of The Central Railroad were the same as the values they gave on these appeals. The values they gave on the aforesaid 1942 appeals were rejected by the State Board of Tax Appeals for the reasons set forth in the opinion of the Board, printed in 20 *N. J. Mis. R.* 448; 28 *Atl. Rep.* (*2d*) 660.

For the reasons set forth in the opinion in the 1942 case, and also for the further reasons set forth in this opinion, it is obvious that their valuations of the land in the Jersey City terminal of The Central Railroad are purely speculative and should not be considered by this Board in determining the true value of the land here under appeal.

For the same fundamental reasons that the Board should not consider the appraised values placed by the witnesses Messrs. Daly and Coffin on the land in the Jersey City terminal of The Central Railroad, the Board should not consider the appraised values placed upon this land by the witnesses Messrs. William C. Stewart and John J. Mantell.

Mr. Thomas A. Ryer testified as a real estate expert. He has been a resident of Jersey City all his life and, for the past 42 years, he has been in the real estate business in Jersey City. He has been intimately familiar with the land, water facilities and improvements along the west shore of the Hudson River, New York Bay and Kill von Kull for the past thirty-five years. He appraised all of the lands owned by the Hoboken Manufacturers Railroad, and all of the lands located in Hudson and Bergen Counties owned by the New York Central Railroad; Delaware, Lackawanna and Western Railroad; Erie Railroad; Pennsylvania Railroad; Lehigh Valley Railroad, and The Central Railroad of New Jersey. He has appraised at various times all the lands fronting on the Hudson River, New York Bay, Kill von Kull, Passaic River and Hackensack River located in Hudson, Essex and Bergen Counties. In fact, Mr. Ryer has been generally recognized for many years as one of the best qualified experts on the value of waterfront properties in Hudson County. His qualifications and experiences are very extensive. He valued the property here under appeal in the Jersey City terminal of The Central Railroad as follows:

| | Description | Area Acres | Value |
|---|---|---|---|
| 1. | Water Front Passenger Depot and Piers 1-2-5-6-7 | 99.621 | $3,486,735 |
| 2. | Water Front Pier 9 & Port Liberty Yard, | 20.950 | 314,250 |
| 3. | Water Front Piers 10 & 12 | 71.300 | 1,069,500 |
| 4. | Water Front Piers 13 & 14 | 84.724 | 1,016,685 |
| 5. | Water Front Coal Pier Basin | 71.503 | 715,030 |
| 6. | Water Front Pier 18 | 95.587 | 1,529,392 |
| 7. | Water Front Marine Repair Yard | 31.346 | 282,114 |
| 8. | South of M. S. bet. Passenger Depot tract & Jersey Avenue produced | 28.718 | 430,770 |
| 9. | North of M. S. bet. Passenger Depot tract & Jersey Avenue produced | 25.014 | 375,210 |
| 10. | North of M. S., N. E. of Round House | 3.120 | 37,440 |
| 11. | Engine Terminal plot | 20.423 | 204,230 |
| 13. | Strip bet. Phillip St. & Phillip St. Branch | 5.610 | 44,880 |
| 14. | Old Round House plot, north of M. S., east of Communipaw Ave. | 3.755 | 30,040 |

| | Description | Area Acres | Value |
|---|---|---|---|
| 15. | Strip south of M. S., east of Communipaw Ave. ...... . ...... ... .......... | 0.326 | 2,608 |
| 16. | Claremont Yard, North of M. S., west of Communipaw Ave. ................ | 15.212 | 121,696 |
| 17. | South of M. S., west of Communipaw Ave., | 6.680 | 53,440 |
| 18. | South of M. S., east & west of Caven Point Road ....................... | 9.897 | 79,176 |
| 19. | South of Phillip St. Branch, west of former L. V. crossing ... . .. .......... | 1.557 | 6,228 |
| 19A. | Outside M. S. roadway approach to Marine Yard & Lighterage pier ......... | 0.781 | 6,248 |
| 20. | North of Pl llip St. Branch, west of former L. V. crossing . ..... .......... | 2.580 | 12,900 |
| 21. | North of '. V. R. R. west of Caven Point Road (Claremont Material Yd.) ..... | 8.620 | 68,960 |
| 22. | Van Nostrand Place Station Grounds ... | 0.297 | 1,782 |
| 23. | East & west of M. S. bet. L. V. R. R. crossing at "Point of Rocks" and Chapel Ave. ............................. | 1.408 | 8,448 |
| | Totals ....................... | 609.029 | $9,897,762 |

Mr. Charles W. Morrison testified as a real estate expert. In 1908 Mr. Morrison graduated as a civil engineer from the Massachusetts Institute of Technology. He has been an industrial realtor since 1912 and has made a careful and thorough study of the value of waterfront properties in New York Harbor since that time. He has been a licensed real estate broker of New Jersey since 1923. From 1917 to 1919 he was land appraiser for the Bureau of Valuations of the Interstate Commerce Commission. From 1923 to 1936 he was in the appraisal department of Joseph P. Day, Inc. Since 1937 he has been a vice-president of Cross & Brown, Inc., a large and highly reputable real estate firm in New York City, and is in charge of their appraisal work. His knowledge of sales and leases and also his direct contact with transactions involving waterfront property in New York Harbor. including the New Jersey side, has been very extensive. Mr. Morrison valued the land in The Central Railroad Terminal in Jersey City as follows:

| Index No. | Description | Area Acres | Total |
|---|---|---|---|
| 1. | Water front passenger depot and Piers No. 1, 2, 5, 6 and 7 ................... | 99.621 | $3,486,735 |
| 2. | Water front—Pier 9 .................. | 20.95 | 282,825 |
| 3. | Water front—Piers 10 to 12 ........... | 71.3 | 891,250 |
| ·4. | Water front—Piers 13 and 14 .......... | 84.724 | 1,059,050 |
| 5. | Water front—Coal pier basin ..........'. | 71.503 | 572,024 |
| 6. | Water front—Pier 18 ................. | 95.587 | 1,433,805 |
| 7. | Water front—Marine Yard Tract ...... | 31.346 | 470,190 |
| 8. | South of main stem between passenger depot tract & Jersey Ave. extended .... | 28.718 | 358,975 |
| 9. | North of main stem between passenger depot tract & Jersey Ave. extended .... | 25.014 | 312,675 |
| 10. | North of main stem, N. E. of round house, | 3.12 | 31,200 |
| 11. | Engine terminal plot .................. | 20.423 | 163,384 |
| 13. | Strip between Phillip St. and Phillip St. Branch ......................... | 5.610 | 44,880 |
| 14. | Old round house plot, north of main stem, | 3.755 | 30,040 |
| 15. | Strip south of main stem .............. | .326 | 2,608 |
| 16. | Claremont Yard, north of main stem .... | 15.212 | 91,272 |
| 17. | South of main stem, W. of Communipaw Ave. ............................. | 6.680 | 40,080 |
| 18. | South of main stem, east & west of Caven Point Road ...................... | 9.897 | 59,382 |
| 19. | South of Phillip St. Branch, west of former Lehigh Valley crossing ............. | 1.557 | 6,228 |
| 19a. | Outside main stem, roadway approach to marine yard & lighterage pier ....... | .781 | 3,124 |
| 20. | North of Phillip St. Branch, west of former Lehigh Valley R. R. crossing ........ | 2.580 | 10,320 |
| 21. | North of Lehigh Valley R. R., west side of Caven Point Road .................. | 8.62 | 68,960 · |
| 22. | Van Nostrand Place Station grounds ... | .297 | 1,782 |
| 23. | East and west of main stem between Lehigh Valley R. R. crossing at "Point of Rocks" and Chapel Ave. ............ | 1.408 | 7,040 |
| | Totals ........................ | 609.029 | $9,427,829 |

Mr. Morrison was cross-examined at great length, but at no time was his direct testimony injured by the cross-examination. In fact, on cross-examination, he materially strengthened the testimony of appraisals he gave on direct examination by supplementing and explaining his direct testimony by sound and logical reasoning.

Mr. Ralph E. Thompson testified as a real estate expert. Mr. Thompson is assistant tax agent of The Central Rail-

road. On direct examination he gave a very complete analysis of the sales of waterfront properties along the Hudson River, New York Bay and Kill von Kull. He also analyzed thoroughly the abandonment of about 1,500 acres of waterfront and back land property in the vicinity of the Jersey City terminal of The Central Railroad. He valued the land in the Jersey City terminal as follows:

| Index No. (1) | General Location (2) | Area Acres (3) | Total Value (5) |
|---|---|---|---|
| 1. | Water Front, passenger depot and Piers 1, 2, 5, 6 & 7 | 99.621 | $1,992,420 |
| 2. | Water Front, Pier 9 | 20.950 | 314,250 |
| 3. | Water Front, Piers 10 to 12 | 71.300 | 570,400 |
| 4. | Water Front, Piers 13 & 14 | 84.724 | 677,792 |
| 5. | Water Front, Coal Pier Basin | 71.503 | 572,024 |
| 6. | Water Front, Pier 18 | 95.587 | 955,870 |
| 7. | Water Front, Marine Yard Tract | 31.346 | 250,768 |
| 8. | South of Main Stem, between passenger depot tract and Jersey Ave. produced | 28.718 | 172,308 |
| 9. | North of Main Stem, between passenger depot tract and Jersey Ave. produced | 25.014 | 150,084 |
| 10. | North of Main Stem, northeast of round houses | 3.120 | 18,720 |
| 11. | Engine Terminal plot | 20.423 | 122,538 |
| 13. | Strip between Phillip St. and Phillip St. Branch | 5.610 | 33,660 |
| 14. | Old Round House plot, north of Main Stem, east of Communipaw Ave. | 3.755 | 22,530 |
| 15. | Strip south of Main Stem, east of Communipaw Ave. | 0.326 | 1,956 |
| 16. | Claremont Yard, north of Main Stem, west of Communipaw Ave. | 15.212 | 60,848 |
| 17. | South of Main Stem, west of Communipaw Ave. | 6.680 | 26,720 |
| 18. | South of Main Stem, east and west of Caven Point Road | 9.897 | 39,588 |
| 19. | South of Phillip St. Branch, west of former L. V. crossing | 1.557 | 3,114 |
| 19A. | Outside Main Stem, roadway approach to Marine Yard and Lighterage pier | 0.781 | 1,562 |
| 20. | North of Phillip St. Branch, west of former L. V. crossing | 2.580 | 5,160 |
| 21. | North of L. V. R. R., west of Caven Point Road (Claremont Material Yard), | 8.620 | 43,100 |
| 22. | Van Nostrand Place station grounds | 0.297 | 1,188 |

| Index No. (1) | General Location (2) | Area Acres (3) | Total Value (5) |
|---|---|---|---|
| 23. | East and west of Main Stem between L. V. R. R. crossing at "Point of Rocks" and Chapel Ave. ........................ | 1.408 | 5,632 |
| | Totals ........................ | 609.029 | $6,042,232 |

Mr. Thompson was cross-examined for over two days, but at no time did the cross-examination tend to damage the very illuminating analytical and logical testimony of the transactions involving comparable land that he gave in support of the appraisals he made of the land under appeal.

Messrs. Ryer, Morrison and Thompson were able to support their opinions of the value of the land under appeal by references to sales of comparable property in the vicinity of the land under appeal and at times reasonably close to the assessing date.

The record and date of a large number of recent sales of both waterfront and back land property in the vicinity of the Jersey City terminal of The Central Railroad and comparable thereto were put into evidence. I will now discuss a few of those sales in this opinion.

In June, 1938, the Hudson Realty Company, a subsidiary of the Delaware, Lackawanna and Western Railroad, sold to the General Foods Company 10.413 acres of Hudson River waterfront property with railroad connections located at the foot of Eleventh and Twelfth Streets, Hoboken. This property has a frontage of 478 feet on Hudson Street. The depth of the upland portion of the property extending from Hudson Street to the water line is from 700 to 923 feet. The waterfront is about 203 feet wide along the bulkhead line. The land under water from the bulkhead line to the pierhead line is from about 327 feet to 355 feet. The selling price for this property was $285,000. The purchaser also agreed to pay $10,000 toward the payment of any broker's commissions. If the sales price is considered to be the sum of these two amounts to wit, $295,000, and the full amount attributed to land value only, the property sold at the rate of $28,330 per acre. The contract of sale describes this land as "a tract of

land in the City of Hoboken * * * which is adaptable for development as a rail and water terminal, and which the Foods Corporation wishes to purchase as a site for manufacturing, warehousing and other purposes." Therefore, the price paid for this property of $28,330 per acre is a good indication of the value of Hudson River waterfront facilities, having both railroad connections and convenient improved city street approaches to the upland.

A piece of land of the same size and dimensions as the above General Foods property in Hoboken carved out of the Jersey City terminal of The Central Railroad at The Central Railroad ferry slips (which is the most valuable part of the Central Railroad terminal waterfront) would have the same waterfront facilities and waterfront advantages as the Hoboken property. They both front on the main channel of the Hudson River. The principal difference between the General Foods property in Hoboken and a similar piece of land located at The Central Railroad ferry slips in Jersey City lies in the upland. The upland part of the Hoboken property fronts on a principal city street, and is easily accessible from the land side of the property, whereas the property located at the ferry slips of The Central Railroad in Jersey City is separated from the downtown area and water front sections of Jersey City by a tidewater basin and the freight terminal yards of the Lehigh Valley Railroad, and it is not accessible from the land side of the property except through the terminal yards of The Central Railroad. The nearest city street is about a mile away from the ferry slips.

In May, 1941, the Standard Oil Company of New Jersey sold to the Marine Maintenance Corporation 28.09 acres of waterfront and rail terminal property on the Kill von Kull in the Constable Hook section of Bayonne. This property had on it at the time of the sale an old timber pier, a hollow tile and concrete warehouse containing 17,000 square feet of floor space, a railroad siding, and some other minor structures. The sales price was $200,000, which is at the rate of $7,120 per acre. In considering this sale in connection with the appraisal of the property here under appeal, I have attributed the entire selling price to the value of the land.

The water front facilities and waterfront advantages of this property with its railroad connections are as good or even better than the waterfront facilities and waterfront advantages of the Jersey City terminal of The Central Railroad, except that portion of The Central Railroad terminal fronting on the main channel of the Hudson River. The price paid for this property is a good indication of the value of waterfront facilities with railroad connections on the New Jersey side of the Upper New York Bay.

In December, 1937, the Socony-Vacuum Company sold to the Asiatic Petroleum Company 11.61 acres of waterfront and rail terminal property on the Kill von Kull in the Constable Hook section of Bayonne for $212,500. This property is located about 1,000 feet east of the property sold by the Standard Oil Company above mentioned. The sale of the Socony-Vacuum Company property included two double decked piers and a four-story re-enforced concrete factory building containing approximately 40,000 square feet of floor space. The waterfront facilities and waterfront advantages of this property with its railroad connections are as good or even better than the waterfront facilities and waterfront advantages of the Jersey City terminal of The Central Railroad except that portion of The Central Railroad terminal fronting on the main channel of the Hudson River.

The three sales heretofore mentioned of waterfront property with railroad connections; to wit, the sale of the property in Hoboken to the General Foods Company, and the two sales of the two parcels in Bayonne, provide the Board with splendid guideposts to the value of the waterfront facilities with railroad connections of The Central Railroad terminal properties in Jersey City.

In November, 1941, the City of Jersey City sold to the United States government 329.537 acres of undeveloped land, mostly under water, located in Jersey City on the northerly side of the Claremont terminal of the Lehigh Valley Railroad. Jersey City acquired this property from the Lehigh Valley Railroad. The property was purchased by the Lehigh Valley Railroad some twenty to twenty-five years ago for development as a railroad terminal in connection with its present

Claremont terminal. Taxes were allowed to lapse on this property so that by August 11th, 1941, Jersey City had acquired a lien on this property for unpaid taxes, interest and penalties in the total amount of $2,547,122.44, or about $7,742 per acre. Prior to August 11th, 1941, the Lehigh Valley Railroad had been negotiating with the United States government for the sale of this property to the United States government for use as an army supply base for the shipment of supplies over seas. The United States government refused to buy the property from the Lehigh Valley Railroad because of the large amount of tax liens which had accumulated against the property. By mutual understanding, the Lehigh Valley Railroad turned this property over to Jersey City by deed dated August 11th, 1941, in lieu of the aforesaid tax liens. Jersey City accepted the deed for the property, and then sold the property to the United States government for $2,000,000, which is at the rate of $6,070 per acre. In order to enlarge this tract, the United States government purchased from the Lehigh Valley Railroad on August 14th, 1942, two adjoining parcels of unimproved land. One of these two parcels contains 2.597 acres of upland along the railroad tracks of the Lehigh Valley Railroad, and the other parcel contains 8.212 acres of land under water lying between the bulkhead line and the pierhead line. The purchase price for both parcels was $63,500, which is at the rate of $5,874 per acre. In these two purchases, the one from Jersey City and the other from the Lehigh Valley Railroad, the United States army acquired about 90 acres of unimproved upland with railroad connections and about 250 acres of abutting unimproved land under water at an average cost of $6,062 per acre. The United States army filled in part of this land under water back of the bulkhead line at a cost of about $5,000 per acre. This would, therefore, indicate a selling price of about $11,000 per acre for filled land. This filled property now has on it a railroad track and some government buildings. At its waterfront the United States army now loads ocean-going steam vessels with ammunition and other supplies for the United States armed forces over seas. In many respects this army supply base is highly comparable

to the land in the southerly part of The Central Railroad terminal in Jersey City which is here under appeal.

In July, 1937, the City of Bayonne purchased from the State of New Jersey (Board of Commerce and Navigation) 200 acres of land under water lying between the bulkhead line and the pierhead line on the main channel in the Upper New York Bay north of Constable Hook in the City of Bayonne. This land was purchased for the purpose of developing a marine terminal. It is now part of the development under construction by the United States navy as a navy yard. The purchase price was $600,000, which is at the rate of $3,000 per acre.

In March, 1940, the Trebor Realty Corporation, a subsidiary of the Standard Oil Company of New Jersey, sold to the American Wax Refining Company 2.079 acres of upland on Caven Point Road in Jersey City for $20,000, which is at the rate of $9,620 per acre. This property had erected on it at the time of the sale a hollow tile industrial building and some tanks which were included in the sale price of $20,000.

In March, 1938, the Standard Oil Company sold to Tankport Terminals, Inc., 17 acres of upland on Caven Point Road in Jersey City for $170,000, which is at the rate of $10,000 per acre. There were some structures on this land at the time of the sale, but the parties to the sale did not take them into consideration in determining the selling price. The property was sold at the price of $170,000 as the value of the land only. These 17 acres were a part of a larger tract of Upper New York Bay waterfront property owned by the seller at the time of the sale. Simultaneously with the sale, the purchaser entered into a lease with the Lehigh Valley Railroad for the right to berth ships in the Lehigh Valley's Claremont terminal channel, and also the right to lay and maintain a pipeline from said berthing place to the land purchased from the Standard Oil Company.

The properties involved in the two sales just above mentioned are in very close proximity to each other, and are within 3,000 feet of the southerly boundary of The Central Railroad terminal land here under appeal. They are com-

parable in a high degree to the rear of those waterfront tracts of The Central Railroad terminal land here under appeal which front on the Upper New York Bay. The prices paid for them per acre are a good indication of the value of the land in the rear of the waterfront tracts in the southerly portion of the Central Railroad terminal in Jersey City.

In these several sales of land heretofore mentioned, all of which took place near the assessing date of the assessments here under appeal, the Board can find important data to help guide it in making an appraisal of the land in The Central Railroad terminal in Jersey City. The sales of waterfront properties in Hoboken, Jersey City and Bayonne are an indication of the value of waterfront facilities with railroad connections along the Hudson River and Upper New York Bay; the sales of land under water in Bayonne and Jersey City are an indication of the value of land under water or the value of riparian rights; the two sales in Jersey City of upland properties are an indication of the value of the back land portions of the large tracts of waterfront property here under appeal; and the sale of the large tract in Jersey City containing 329.537 acres is an indication of the value of a large parcel of land which is capable of being developed into a railroad freight terminal with waterfront facilities on the Upper New York Bay. In these several sales can be found many of the elements of value which would enter into an appraisal of the land in The Central Railroad terminal in Jersey City.

I have examined the economic or productive value of the land in The Central Railroad terminal in Jersey City as railroad terminal property separated from the rest of The Central Railroad system, and also as an integral part of that system. I have examined its economic or productive value as the terminal of a larger railroad system with a longer road haul. I have examined the economic or productive value of the other terminal railroad yards in Hudson County, New Jersey, fronting on the Hudson River or Upper New York Bay. I have examined the economic or productive value of railroad property in the United States generally. The evi-

dence of the future income which may be reasonably expected from using the land in The Central Railroad Terminal in Jersey City for railroad purposes rejects any contention that such use of the land would be more profitable than any other use to which it might be put. The costs incurred at the water front in transferring the freight from rail to lighter or *vice versa* and the cost of floating the freight across the Hudson River are costs of necessary railroad terminal operations which cannot be eliminated by any efficient management of the terminal property. The natural condition of the harbor makes such railroad terminal operations necessary and the water front property used for these operations is not required for any other railroad purpose.

Even if it is conceded, for the sake of argument, that the land in The Central Railroad terminal used for railroad purposes is being put to its highest and best use, still it cannot be given the high value claimed for it by some of the real estate experts because its use for railroad purposes does not produce a profit, but instead, a heavy loss. The only basis for land value is the profit derived from its use. If there is a large return from the use of a particular tract or parcel, the value would be high. If the result of use is a loss rather than a profit, the value would be zero except for the possibility that future developments may bring a change in this situation. But the Board is not justified in assessing land at high value merely on the basis of indefinite and uncertain future prospects when the result of current use is a deficit, with no prospect of its early transformation into a surplus.

The United States Supreme Court said in the Minnesota rate cases, *Simpson* v. *Shepard,* 230 *U. S.* 352; 33 *S. Ct.* 729; 57 *L. Ed.* 1511, that:

"It is not admissible to attribute to the property owned by the carriers a speculative increment of value, over the amount invested in it and beyond the value of similar property owned by others solely by reason of the fact that it is used in the public service. That would be to disregard the essential conditions of the public use, and to make the public use destructive of the public right."

The court then went on to say that the value of the property in railroad use "cannot properly extend beyond the fair average of the normal market value of land in the vicinity having a similar character. We therefore hold that it was error to base the estimates of value of the right of way, yards, and terminals upon the so-called 'railway value' of the property."

It is reasonable to assume that the purchaser of land has expectations of putting it to a higher and better use than the seller could. Otherwise there would be very few sales of land. There are no recent sales of waterfront land for railroad use along the Jersey shore of the Hudson River or New York Bay. There are, however, sales of such waterfront property both by railroads and other owners of such waterfront land for uses other than railroad use. There are also abandonments of such waterfront property by railroads, and this abandoned property will unquestionably be used for some purpose other than railroad use. As a matter of fact, a substantial amount of such water front acreage has been recently sold for uses other than railroad use.

I conclude that the prices paid for water front properties provide a fair indication of the value of those properties in the highest and best use to which they can presently be put. I conclude that these prices, together with the evidence of loss resulting from the use of similar waterfront properties by the railroad, refute the contention that a higher value should be imputed to those properties simply because they are owned and used by a railroad rather than by someone else.

Together with the sales heretobefore mentioned, I have also carefully examined the record and data of all sales and abandonments of property that have been put into evidence. I have also taken into consideration the appraisals of the land under appeal as testified to by the real estate experts. From a very careful examination and consideration of all the evidence, which is far too voluminous to analyze in this opinion (the typewritten record contains 3,744 pages and, in addition, there are 178 exhibits), I have found and determined the true value of the second class railroad property under appeal to be as follows:

| Item No. | Description of Property | Area in Acres | True Value |
|---|---|---|---|
| 1. | Land outside main stem, Terminal Tract at Jersey City, tract extending from southerly line of Lehigh Valley R. R., on the north to the northerly line of land, formerly leased to the North River Coal & Wharf Co., on the south and from a line about 160′ west of the west line of Van Vorst St. produced, eastwardly to the exterior line for piers, exclusive of main stem, Block 2145, Plot 49, 47-A, and portion of Plot 51, incl. value of Plot 49-E, under water ....... .... ............. | 99.621 | $3,984,840.00 |
| 2. | Land outside main stem, excess Block 2145, Plot 48-F (formerly North River Coal & Wharf Co.) ....... | 20.950 | 523,750.00 |
| 3. | Land outside main stem, extending from Phillips St. to the exterior line for piers, Block 2145, Plot 48-D, including value of Plot 48-G, under water ...... ................... | 71.300 | 1,782,500.00 |
| 4. | Land outside main stem, extending from Phillips St. Branch to exterior line for piers, Block 2154, Plot 22-G, including value of Plot 22-H, under water ......................... | 84.724 | 1,948,652.00 |
| 5. | Land outside main stem, excess Block 2154, part of Plot 22-J North .... | 71.503 | 1,430,060.00 |
| 6. | Land outside main stem, coal pier No. 18 and approach extending from Junction of Phillips St. Branch and Communipaw Branch, L. V. R. R. to pierhead line, being a strip of land, formerly part of 22-J, 800′ wide with an average length of about 5,477′, exclusive of portion of Steers lease ................. | 95.587 | 1,911,740.00 |
| 7. | Land outside main stem, Marine Repair Yard Tract, 475′ wide, extending from pierhead line on the east to L. V. R. R. Co. and Phillips St. on the west formerly part of Plot 22-J south, exclusive of portion of Steers lease ................... | 31.346 | 626,920.00 |
| 8. | Land outside main stem, excess south of main stem, between a line about 160′ west of west line of Van | | |

| Item No. | Description of Property | Area in Acres | True Value |
|---|---|---|---|
| | Vorst St., produced, and center line of Jersey Ave., exclusive of land leased by the North River Coal & Wharf Co., and tract south thereof, Blk. 2145, portion of Plot 51 ..... | 28.718 | 574,360.00 |
| 9. | Land outside main stem, excess north of main stem, between a line about 160' west of the west line of Van Vorst St., produced to the center line of Jersey Ave. (to the west line grant) Block 1245, Plot 50 ... | 25.014 | 500,280.00 |
| 10. | Land outside main stem, excess width in Block 2048, Plot H .......... | 3.120 | 56,160.00 |
| 11. | Land outside main stem, Block 2048, bounded on the north by Wilson Ave., on the south by Phillips St., on the west by Communipaw Ave., and on the east by center line of Jersey Ave., produced ........... | 20.423 | 367,614.00 |
| 13. | Land outside main stem, excess width in Block 2154, Plot 22-D ........ | 5.610 | 84,150.00 |
| 14. | Land outside main stem, excess width in Block 2048, Plot P ........... | 3.755 | 56,325.00 |
| 15. | Land outside main stem, excess width in Block 2048, Plot N ............ | 0.326 | 4,890.00 |
| 16. | Land outside main stem, excess between C. R. R. of N. J. and L. V. R. R. of N. J. at Claremont, Block 2020, Plot 4; Block 2033, Plots 8 and 22-D (Graded) ...... ..... | 15.212 | 182,544.00 |
| 17. | Land outside main stem, excess in Claremont Yard, Block 2154, Plot 7 and 7-B ................. ....... | 6.680 | 80,160.00 |
| 18. | Land outside main stem, excess between C. R. R. of N. J. and National Docks Railway at Claremont ........................ | 9.897 | 118,764.00 |
| 19. | Land outside main stem, excess between Phillips St. Branch and Communipaw Branch, L. V. R. R., Block 2154, Plot 17-A .......... | 1.557 | 18,684.00 |
| 20. | Land outside main stem, excess between Phillips St. Branch and National Docks Railway, at Claremont, Block 2154, Plot 12-A .......... | 2.580 | 30,960.00 |
| 19A. | Land outside main stem, roadway approach to Marine Yard and Lighterage pier ..................... | 0.781 | 9,372.00 |

| Item No. | Description of Property | Area in Acres | True Value |
|---|---|---|---|
| 21. | Land outside main stem, excess north of main stem, at Caven Point Road, between L. V. R. R. Co. and Morris Canal, Block 1491, Plot 1 .... | 8.620 | 86,200.00 |
| 22. | Land outside main stem, excess Van Nostrand Place station grounds ... | 0.297 | 2,970.00 |
| 23. | Land outside main stem, excess east and west of main stem, between L. V. R. R. Crossing and Chapel Ave. ........................... | 1.408 | 14,080.00 |
| | Totals ...................... | 609.029 | $14,395,975.00 |

I have found and determined that the true value of the land located in the main stem of The Central Railroad and known as Class I property, which is here under appeal, is as follows:

| Item No. | General Location | Area in Acres | True Value |
|---|---|---|---|
| | **PHILLIPS STREET BRANCH, JERSEY CITY** | | |
| 1. | From beginning of Branch at junction with ? .in Line to Caven Point Road .. | 0.815 | $9,780.00 |
| 2. | To National Docks Ry. .............. | 0.964 | 11,568.00 |
| 3. | To Communipaw Branch, L. V. R. R. ... | 1.696 | 20,352.00 |
| 4. | To end of Branch at Jct. with main Line, | 10.152 | 152,280.00 |
| | Sub-Total, Phillips Street Branch .... | 13.627 | $193,980.00 |
| | **MAIN LINE, JERSEY CITY** | | |
| 1. | From bulkhead line to line 160' west of Van Vorst St. produced ............. | 5.464 | $191,240.00 |
| 2. | To Jersey Ave. produced ............. | 6.302 | 126,040.00 |
| 3. | To center line of National Docks Ry. ... | 2.181 | 39,258.00 |
| 4. | To center line of Communipaw Ave. ... | 1.768 | 26,520.00 |
| 5. | To Caven Point Road ................. | 3.358 | 100,296.00 |
| 6. | To Linden Ave. ...................... | 15.452 | 139,068.00 |
| 7. | To Gates Ave. ....................... | 4.595 | 41,355.00 |
| 8. | To North Edge of Canal .............. | 4.467 | 40,203.00 |
| | Sub-Total, Main Line, Jersey City ... | 48.587 | $703,980.00 |
| | **MAIN LINE, BAYONNE** | | |
| 1. | From Morris Canal to Center Line of Center Street ...................'.... | 3.624 | $32,616.00 |
| 2. | To Center Line of East 32nd Street .... | 8.898 | 80,082.00 |

| Item No. | General Location | Area in Acres | True Value |
|---|---|---|---|
| 3. | To Center Line of East 30th Street ..... | 1.889 | 17,001.00 |
| 4. | To East 22nd Street .................. | 5.841 | 52,569.00 |
| 5. | To East 21st Street .................. | 0.773 | 6,957.00 |
| 6. | To Linnet Street ..................... | 4.593 / 2.900 | 41,337.00 / 26,100.00 |
| 7. | To Avenue "D" (Broadway) .......... | 0.851 | 7,659.00 |
| 8. | To Avenue "C" ..................... | 1.448 | 13,032.00 |
| 9. | To Hudson County Boulevard .......... | 2.879 | 25,911.00 |
| 10. | To Avenue "A" ..................... | 0.888 | 8,002.00 |
| 11. | To exterior line for solid filling, Newark Bay .... .............. .......... | 3.191 | 28,719.00 |
| | Sub-Total, Maine Line, Bayonne ...... | 37.775 | $339,985.00 |

NEWARK AND NEW YORK BRANCH, JERSEY CITY

| Item No. | General Location | Area in Acres | True Value |
|---|---|---|---|
| 1. | From Communipaw "Y" to Main Line ... | 1.018 | $12,216.00 |
| 2. | From Ely Line of Communipaw Ave. to Jct. with M. L. .................... | 0.700 | 10,500.00 |
| 3. | Triangle Jct. M. L. to Ely Line Communipaw Ave. ........................... | 0.216 | 2,592.00 |
| 4. | From Main Stem of M. L. to point east of Suydam Ave. .................... | 0.920 | 11,040.00 |
| 5. | To Pacific Ave. ...................... | 2.350 | 28,200.00 |
| 6. | To Halladay Street .................. | 0.546 | 6,552.00 |
| | North of Center Line between Van Horn and Woodward Sts. ............... | 0.208 | 2,496.00 |
| 7. | To Garfield Ave. ..................... | 1.981 | 23,772.00 |
| 9. | To Randolph Ave. .................... | 0.597 | 7,164.00 |
| 10. | To Clerk Street ..................... | 1.600 | 24,000.00 |
| 11. | To East Side of Jackson Ave. .......... | 2.300 | 34,500.00 |
| 12. | To Hudson Boulevard ................ | 3.610 | 54,150.00 |
| 13. | To West Side Ave. ................... | 3.327 | 39,924.00 |
| 14. | To Mallory Ave. ..................... | 2.350 | 18,800.00 |
| 15. | To Morris Canal ..................... | 2.201 | 17,608.00 |
| 16. | To Hackensack River ................ | 1.753 | 8,765.00 |
| | Sub-Total, Newark and New York Branch, Jersey City .............. | 25.677 | $302,279.00 |

On December 10th, 1942, the State Tax Commissioner delivered to The Central Railroad and to the County Boards of Taxation a detailed statement of his valuation as of January 1st, 1942, of the property of The Central Railroad used for railroad purposes which he made in November, 1942. Together with this detailed statement of his valuation of The Central Railroad property, the State Tax Commissioner

delivered to The Central Railroad a letter addressed to. The Central Railroad and signed by him in his official capacity, in which he said:

"Pursuant to the provisions of chapter 291, *Pamph. L.* 1941, as amended [*N. J. S. A.* 54:29A–1, *et seq.*], designated as the Railroad Tax Law of 1941, the State Tax Commissioner herewith transmits to you a statement of the valuation as of January 1st last, of your property subject to taxation for State and local uses, as tentatively fixed. * * *

"Chapter 291, *Pamph. L.* 1941, provides that the State Tax Commissioner shall complete his valuations by the 1st day of November and on or before December 10th next following he shall serve upon each taxpayer a detailed statement of the assessed valuation of the property of such taxpayer in the State, including the several classes of property.

"Any railroad or the Attorney-General on behalf of the State and of the taxing districts, claiming that error has been made in the assessment of property may, on or before the third Monday in January following, file a petition for review specifying the grounds of complaint and the relief sought."

The State Tax Commissioner testified that the valuation of The Central Railroad property contained in the aforesaid detailed statement was made on November 16th, 1942.

On January 27th, 1943, the State Tax Commissioner canceled the above-mentioned valuation of The Central Railroad property.

On February 4th, 1943, the State Tax Commissioner made a new valuation of The Central Railroad property without having held any hearing on his previous valuation.

On February 4th, 1943, the State Tax Commissioner addressed another letter to The Central Railroad, in which he said:

"The primary valuations as of January 1st, 1942, of property in railroad use of The Central Railroad Company of New Jersey for the tax year 1943, fixed by me on November 1st, 1942, a detailed statement of which was delivered to you before December 10th, 1942, were the same valuations determined by the judgment entered by the State Board of Tax

Appeals, in the matter of the appeal of Shelton Pitney and Walter P. Gardner, as Trustees of The Central Railroad Company of New Jersey, from the 1942 assessment of railroad taxes against said company. * * *

"Therefore, you are hereby notified that I did, under date of January 27th, 1943, cancel the primary valuation of the property in railroad use of The Central Railroad Company of New Jersey for the year 1943, as heretofore made by me, and I did, under date of February 4th, 1943, re-value said property, using my best judgment as to the true value thereof as of January 1st, 1942, in the aggregate sum of $81,798,671, a detailed statement of which is hereto attached and delivered to you herewith."

There is nothing in the statutes which permits the State Tax Commissioner to cancel his valuation of property in railroad use after it is once made. The statutes permit the State Tax Commissioner to correct his valuation. The law also provides for an appeal to the State Board of Tax Appeals from the State Tax Commissioner's assessment of the tax, and such an appeal permits this Board to review the State Tax Commissioner's valuation as corrected. These are the only legal methods for changing the valuation of the State Tax Commissioner after it has been made.

The "Railroad Tax Law of 1941" expressly provides that the tax assessed on property used for railroad purposes shall be assessed by the State Tax Commissioner in the manner therein provided. (Sections 7 and 12, chapter 291, *Pamph. L.* 1941; *N. J. S. A.* 54:29A–7, 54:29A–12.) The State Tax Commissioner is a special statutory officer and has no authority except that expressly given him by the statute. *Hoboken* v. *Kelly*, 21 *N. J. Mis. R.* 193; 32 *Atl. Rep.* (2*d*) 710.

Section 17 of the "Railroad Tax Law of 1941" (chapter 291) provides that:

"On or before November first in each year the commissioner shall determine the true value, as of the preceding January first, of all property used for railroad purposes in this State. * * *

"Upon completion of his valuation of property used for

railroad purposes, but not later than December tenth in each year, the commissioner shall deliver a detailed statement thereof, including the several classes of property, to each taxpayer. On or before January tenth, in each year, the commissioner shall certify to the county boards of taxation in the several counties the value of Class II property, situate in each taxing district in the county."

Section 18 of the "Railroad Tax Law of 1941," as amended by chapter 337, *Pamph. L.* 1942; *N. J. S. A.* 54:29A–18, provides that:

"Any taxpayer or the Attorney-General on behalf of the State and of the taxing districts claiming that error has been made in the commissioner's valuations may, on or before the second Monday of January following the completion of such valuations, file a petition for review specifying the grounds of complaint and the relief sought."

Section 19 of the "Railroad Tax Law of 1941," as amended by chapter 337, *Pamph. L.* 1942; *N. J. S. A.* 54:29A–19, provides that:

"On or before April tenth in each year the commissioner shall compute the tax upon property used for railroad purposes and assess the amount thereof to each taxpayer according to his valuations of the preceding year as corrected."

Section 31 of the "Railroad Tax Law of 1941," as amended by chapter 337, *Pamph. L.* 1942; *N. J. S. A.* 54:29A–31, provides that:

"Any taxpayer, the Attorney-General on behalf of the State, or the authorities of a taxing district, desiring to contest the validity or amount of any assessment * * * of property * * * made by the commissioner under this act, may, as to the assessment * * * of property tax, on or before the third Monday of May following the assessment * * * thereof, * * * file a written complaint with the State Board of Tax Appeals, * * *."

The statute is clear and specific on the procedure the State Tax Commissioner must follow in computing and assessing taxes upon property used for railroad purposes. He is directed by the statute to compute and assess the tax in the following manner:

1. *On or before November 1st* he shall determine the true value of the property as of the preceding January 1st;

2. *Not later than December 10th* following the completion of his valuation, he shall deliver a detailed statement thereof to each taxpayer and to the County Boards of Taxation, not later than January 10th following the completion of his valuation;

3. Upon any petition for review being filed by any taxpayer, the Attorney-General, or any taxing district *before the second Monday of January, following the completion of his valuations,* the State Tax Commissioner shall conduct a hearing upon such petition and shall review the valuations of which it complains and correct the same as shall appear just;

4. On or before April 10th he shall compute and assess the tax according to *his valuations of the preceding year* as corrected.

It is obvious that the cancellation by the State Tax Commissioner on January 27th, 1943, of his valuation of The Central Railroad property made in November, 1942, and the making of a new valuation on February 4th, 1943, is not authorized by law. On the contrary, both the cancellation and the new valuation are direct violations of the express provisions of the law. The re-valuation made on February 4th, 1943, could not be served on the taxpayer prior to December 10th, 1942, as the law requires, and, if valid, would deny the legal right of The Central Railroad, the Attorney-General on behalf of the State, or any taxing district to file with the State Tax Commissioner a petition for review of his valuation, because such a petition must be filed before the second Monday in January, 1943. The law says that the valuation shall be made as of the preceding January 1st. Therefore, if the valuation made February 4th, 1943, is valid, the property must be valued as of January 1st, 1943. Whereas, the 1943 tax is based on the value of the property on January 1st, 1942. Moreover, the law says that the tax is to be computed according to the State Tax Commissioner's valuation made the preceding year as corrected. If there was no valuation of The Central Railroad property made in 1942, there can be

no tax in 1943. In order to levy a tax, the provisions of the law must be followed. *Hoboken* v. *Kelly, supra; Sea Isle City* v. *Cape May,* 50 *N. J. L.* 50; 12 *Atl. Rep.* 771; 61 *C. J.* 557, § 683; 61 *C. J.* 560, § 687.

It is obvious that the State Tax Commissioner's valuation made on February 4th, 1943, cannot be considered as a re-assessment of the tax such as is authorized by article 5 of the "Railroad Tax Law of 1941," *N. J. S. A.* 54:29A–25, *et seq.* That provision of the statute authorizes a re-assessment of the *tax*. It does not authorize a re-valuation of the property. The tax is computed and assessed on the valuation made the preceding year. The tax for the year 1943 is computed and assessed in 1943 on the property valuation made in 1942. Furthermore, any re-assessment of the tax is expressly limited by the statute to the "period of five years next preceding the year in which the re-assessment" is made. In other words, it is clear that the tax cannot be re-assessed the same year it is computed and assessed. To re-assess the tax the same year it is assessed would be nonsense, since the tax assessment is made on or before April 10th and an appeal to the State Board of Tax Appeals from such assessment must be taken before the third Monday in May following the assessment.

Therefore, the valuation made by the State Tax Commissioner of The Central Railroad property in railroad use on February 4th, 1943, is *ultra vires,* void, and of no effect. The cancellation on January 27th, 1943, of the valuation of The Central Railroad property in railroad use made by the Commissioner in November, 1942, is likewise *ultra vires,* void, and of no effect. *City of Newark* v. *Weyerhaeuser Timber Co.,* 18 *N. J. Mis. R.* 560; 15 *Atl. Rep.* (*2d*) 224; *New Jersey Tax Reports* 1934-1939, *p.* 530.

The State Tax Commissioner on his own initiative and on his own judgment re-valued the property of The Central Railroad on February 4th, 1943. He testified that he gave no consideration whatever to the fact that the State Board of Tax Appeals had held a hearing and determined the true value of The Central Railroad property in railroad use as of January 1st, 1941. He also testified that he did not know

whether the property of The Central Railroad in railroad use had changed either in value or character between January 1st, 1941, and January 1st, 1942. In fact, he testified that he did not know anything about The Central Railroad property upon which he placed a value on February 4th, 1943, and that he did nothing in the actual appraisal of the property. He explained his re-valuation of the property on February 4th, 1943, by saying that some correspondence he had with the Attorney-General of New Jersey induced him to make the re-valuation. Since there is nothing to justify the action of the State Tax Commissioner in increasing the valuation of The Central Railroad property in railroad use as of January 1st, 1942, over the value fixed by the State Board of Tax Appeals as of January 1st, 1941, the increases in value made by the State Tax Commissioner were wrongfully made, even if he had the power to make the re-valuation. *Skouras Theatres* v. *State Board of Tax Appeals*, 123 *N. J. L.* 52; 8 *Atl. Rep.* (2d) 72.

The valuation of The Central Railroad property used for railroad pur_oses, made by the State Tax Commissioner in November, 1942, and delivered to The Central Railroad and County Boards of Taxation on December 10th, 1942, is the valid and lawful valuation upon which the tax for the year 1943 should be computed and assessed except as modified by this opinion, if any.

In my opinion, the decision of the State Board of Tax Appeals made in the 1942 appeals on the question of grade crossing elimination and on the question of overhead bridges supporting public highways is dispositive of those same questions raised on these appeals. The opinion in the 1942 appeals is reported in 20 *N. J. Mis. R.* 448; 28 *Atl. Rep.* (2d) 660.